[Civ. No. 9212. Second Appellate District, Division One.—December 7, 1933.]

ROSIE BAKER et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION, LONG TURNER CORPORATION et al., Respondents.

Astor Elmassian for Petitioners.

A. I. Townsend, Everett A. Corten, Redman, Alexander & Bacon and R. P. Wisecarver for Respondents.

HOUSER, J.—In this proceeding, the return to a writ of review heretofore issued by order of this court discloses the essential facts that on April 29, 1929, one Peter Baker, who was the husband of one of the petitioners herein, was injured in the course of, and arising out of, his employment, at which time he was taken to a hospital for treatment for said injuries and where he remained and received treatment therefor during the ensuing period of about six weeks, —at the expiration whereof he left the hospital; following which, for an additional interval next thereafter ensuing of approximately four months, he received further treatments; that thereafter he resumed employment, and until about eleven months had expired after the date of his injury he was given "check up" treatments,—at the expiration of which period his permanent disability was officially rated at 16¾ per cent. For and on account of such disability, during a period of 67 weeks following the date of his injury, Baker was paid compensation. Two months after such disability rating was made, although symptoms of pulmonary tuberculosis were noted by an attending physician as constituting a feature of Baker's physical condition, such diagnosis was not regarded as positive. However, within the two weeks next thereafter ensuing, notwithstanding the fact that no "blood sputum" was apparent, "an X-ray of the lungs showed several cavities and wide dissemination of soft shadows. These changes were thought to be tuberculous and the patient was referred to the Los Angeles Gen-

eral Hospital." At about that time Baker permanently discontinued his employment, and for a space of practically two years next thereafter he was engaged in an unsuccessful endeavor to be cured of his ailment. Approximately three years after he sustained the original injury he died "from pulmonary tuberculosis in an advanced stage".

Within one year following the date of the death of Baker, and within 240 weeks from the date of his injury, his widow and his minor son, who are the petitioners herein, filed an application with the respondent Industrial Accident Commission for adjustment of their claim arising out of the conditions and circumstances hereinbefore outlined. To such application, Baker's employer and its insurer filed an answer by which in effect, on the facts alleged, their general liability was denied; and, in addition thereto, the defense of the statute of limitations was interposed. Following the hearing of the matter, after a recitation of the jurisdictional facts, but without making any finding with reference to the issue regarding the statute of limitations, the respondent commission found:

"The said Peter Baker died from pulmonary tuberculosis in an advanced stage, said condition not being caused by, aggravated or accelerated by his said injury of April 29, 1929, . . . "; and thereupon ordered "that the applicants take nothing from said defendants and that said defendants be, and they are hereby relieved from liability upon the claim herein asserted and dismissed herefrom".

A petition for a rehearing of such decision having been regularly denied by the respondent commission, and thereupon in due course, at the instance of petitioners, a writ of review having issued herein, the legality of the decision rendered by the respondent commission is presented for consideration by this court.

The pivotal issue necessarily concerns the question of jurisdiction of the respondent commission to render the decision which is the subject of inquiry; and in that regard the broad governing rule would seem to be that, admitting the existence of jurisdictional facts, if from the record of the proceedings it may be discerned that the decision in question was founded upon substantial evidence, the conclusion reached is final and may not be disturbed by an appellate tribu-

nal. Concretely, in the instant matter the primary question which the respondent commission was called upon to answer was whether the death of Baker from pulmonary tuberculosis was caused, or accelerated, by his original injury. In that connection, and for the purpose of establishing the affirmative thereof, the testimony of two witnesses, who testified in person, together with certificates or reports from either the attending, or the consulting, physicians to Baker, were received in evidence. On behalf of neither the employer nor the insurer, was any direct evidence offered.

Further details of the evidence adduced on the hearing before the respondent commission of the application for adjustment of the claim of the applicants, show that prior to the particular injury sustained by Baker, "he never had any doctor in all his life; only the insurance company examined him before he got his insurance policy, . . . about six or seven years before he got hurt; . . . he was in good health" up to the time of his injury; when he left the hospital at which he was treated for his injury, the fact that he had begun to lose weight was noticed by his wife. From that time on until he permanently quit work, "he was very bad; he was getting worse every day; could not sleep; could not eat; could not talk ever to nobody; was nervous". But it was not until more than one year had elapsed after Baker sustained the injury that any physician made a diagnosis of Baker's condition that would indicate that he was suffering from the effects of tuberculosis. It appears that on May 24, 1930, which was approximately thirteen months after Baker sustained his injury, Dr. Roberts reported "that there were some symptoms of tuberculosis . . . " On June 10, 1930, Dr. Mason was consulted. His report was:

"He stated that the present illness began three months previously with cough. No bloody sputum. Thinks he has had fever off and on. His temperature was 101° F. An X-ray of the lungs showed several cavities and wide dissemination of soft shadows. These changes were thought to be tuberculous and the patient was referred to the Los Angeles General Hospital."

Approximately three months after Dr. Mason examined Baker he was admitted as a patient in the Olive View Sanitarium, and thereafter and during a period of many

months and until the date of his death, Baker was under the personal care of Dr. Rachmel, who testified that on his first examination of Baker he discovered that "he was suffering from,—the diagnosis would be, far advanced tuberculosis, with cavitation in both lungs; . . . the lesions were perhaps about a year in duration. . . . The flare-up may have taken place any time between April and December (the injury having occurred on April 29th), and yet the individual not know it; because of the fact that he was suffering from his injury, which focused his entire attention on his injury." In connection with the predisposing cause of the disease of tuberculosis, Dr. Rachmel testified that:

"The prevailing theory of tuberculosis is that at some time or other in the life of nearly every individual, some theories have stated as high as 90% of all people have been inoculated with tuberculosis; that this inoculation has never in a great percentage of individuals flared up, but has lain dormant in the trachea, or the bronchial glands, and that at some time later, in after life, due to any one of a number of conditions, these dormant lesions may flare up, and some of the conditions which cause the flaring up *is anything which will lower the resistance of the individual;* . . . It is known that any type of work, of working under conditions which are detrimental to the general health of an individual, or any work which will lower his resistance, is the cause of lighting up of these latent conditions of tuberculosis." He also testified that usually it is "not true that many people develop tuberculosis with no previous history of anything that would indicate lowering of their bodily resistance"; that he subscribed to the theory "that anything that would materially lower a person's vital resistance would make him more susceptible to the tuberculosis germs".

The following questions and answers illustrate the probability of the correctness of the opinion not only that tuberculosis is frequently the result of a lowered resistance in the individual, but as well that lowered resistance caused by the injury sustained by Baker was responsible for the disease from the effects of which he lost his life, to wit:

"Q. But are you willing to admit that it is more of a theory than a demonstrated fact, or do you contend that it can be demonstrated that there is an absolute connection between the two conditions? A. From the light of past

experience in the study of tuberculosis we readily could assume that it is a fact, that is in the study of thousands of cases and thousands of reports, the discussion of tuberculosis cannot be considered as an exact science as you would along physics, and facts and determinations are made in the light of past experience and reports. . . . Q. Now, how do you connect up Mr. Baker's tubercular condition with his employment? A. From the facts as stated regarding his history I believe that many doctors will agree, and I think the majority will agree that any injury which results in causing a condition which will cause waste of tissues and high temperatures for any period of time are sufficient to lower the resistance to the extent that the tubercle bacilli which have been latent in that individual will result in a flaring up of the processes. Q. Well, putting it this way; do you feel that this man's remaining in the hospital for the period of time that he did, did so lower his resistance so that the tuberculosis processes lowered his resistance? A. I believe that it did, to the extent that his injury caused lowering of resistance, so that the tuberculosis process developed and demonstrated itself, let us say, several months after his injury. Q. Would the mere fact that persons confined to the hospital under the circumstances under which he was confined, *per se* result in a lowered resistance? A. I think it would. Q. Now, how much of your answer in this case is based upon what the man may have told you, and how much is based on your idea that such a history as stated would *per se* lower the man's resistance? A. Considering this case simply from the standpoint of an injury of that type being a predisposing cause of tuberculosis. Q. You feel that alone would be sufficient to account for the appearance of tuberculosis? A. I really believe so. . . . Q. Doctor, so far as the hospital records are concerned from your own knowledge what is the cause of the death of Mr. Baker? A. The cause of death was far advanced pulmonary tuberculosis, and my opinion in this particular instance is that the predisposing cause of the pulmonary tuberculosis was this particular injury. That is simply my opinion in this particular case, treating this as an individual.''

In addition to the opinion of Dr. Rachmel, which primarily was based on the facts regarding Baker's history, as well as from his own observations, a statement made by Dr.

Smart was corroborative of the theory that the disease of tuberculosis was the direct result of the injury sustained by Baker. That statement was as follows: "This is to certify that I, Elliott P. Smart, M. D., have been working and specializing in tuberculosis for over fifteen years; that it is common knowledge among those working in this specialty that inoculation with tubercle bacilli may occur either through cuts, abrasions and wounds of the skin, as well as by the usual way through the respiratory or digestive tracts and cause pulmonary tuberculosis."

On the other hand, as hereinbefore has been stated, at the hearing of petitioners' application by the respondent commission, the respondents therein introduced no direct or positive evidence. The finding of fact that "the said Peter Baker died from pulmonary tuberculosis in an advanced stage, said condition not being caused by, aggravated or accelerated by his said injury . . . " if sustained, must therefore depend upon evidence that was presented by the petitioners. In that regard, the only evidence to which attention is directed is the following:

"Q. When he was in good health working, would he have contracted tuberculosis without this injury? A. Well, he could have; he could have contracted tuberculosis without an injury. Q. Without any other ailment? A. The way the question is put is this: that tuberculosis can be present in any individual under any circumstances, and the question as to the time it is discovered is simply due to how much, or—let me change that; instead of how much, how many or how little symptoms occurred. In other words, I mean that it does not necessarily take an injury to produce the tuberculosis. . . . Q. Now, Doctor, you speak about lowered resistance. What is resistance? A. Resistance as applied to an individual could be expressed as that ability to overcome infection and maintain health. Q. Is it measurable? A. It is measurable in definite individuals. Q. How do you measure resistance definitely in an individual? A. I did not say you measure resistance definitely; I said you measure resistance in definite individuals. That is, take an individual and make a thorough examination from all standpoints, and subject them to the ordinary stress and strain of life, and if he *does* through that particular stress and strain he is considered an individual of good health or average resistance.

Q. But it is purely speculative, is it not, doctor? A. Well, you can say that the whole practice of medicine is speculative. Q. No, I am asking you about this theory of lowered resistance; it is purely speculative, is it not? A. Yes, sir. Q. In other words, when a man does not get sick, he has good resistance? A. Yes, sir. Q. If he does, his resistance is poor? A. At that particular moment. Q. Now, that is attributable to mental operations, the matters of habit, and diet also, is it not? A. Yes, sir. . . . Q. Doctor, this basis upon your theory of lowered resistance; now, is it not a fact that every individual in the world at one time or another, from one cause or another, has a lowered resistance? A. Yes, sir. Q. And it is purely speculative as to what the particular thing is that lowered his resistance; is that not so? A. Surely. . . . Q. Are there not just as many people who have tuberculosis that do not have injuries, than those that do? A. I think there are more people that have tuberculosis without injuries than those who have injuries.''

But in connection with the foregoing questions and answers, Dr. Rachmel also made the following statements: ''I would like to say this about the practice of medicine. There are sixteen hundred million individuals in the world, and apparently no two are alike, and therefore the practice of medicine cannot be classified as an exact science, as you would, let us say, physics or geometry. Those sciences are exact; as we know, if you mix certain elements you always get certain results, while in medicine you get no two persons alike, and you never get the same result. . . . The only way I feel about making a positive statement on anything is if you have the same thing happen a good many times in the course of your own experience, you begin to feel that that particular thing is an established fact, and you are willing to go on record as being positive that that is so.''

Reduced to more simple terms, the testimony of Dr. Rachmel upon which the finding in question depends was that, without first sustaining any injury, Baker *might* have contracted tuberculosis; that because ''the practice of medicine cannot be classified as an exact science'', not only the theory of lowered resistance, but also ''what the particular thing is that lowered his (Baker's) resistance'', was ''purely speculative''; and that he thought ''there are more people who have tuberculosis without an injury than with

injuries''. Giving credit to such evidence every force and power to which it may be entitled, nevertheless it does no more than suggest a conflict between the facts to which the witness testified, which were favorable to the applicants, and other testimony which was given by him, which, by considerable straining or violence, might appear favorable to the employer or the insurer. In such a situation, the question then arises whether in this proceeding the finding of fact made by the respondent commission, to which reference hereinbefore has been had, is binding and conclusive upon this tribunal.

Notwithstanding the general language of subdivision (c) of section 67 of the Workmen's Compensation Act, to the effect that ''the findings and conclusions of the commission on questions of fact shall be conclusive and final and shall not be subject to review'', repeatedly it has been ruled that where the findings made by the commission are without evidence to support them, the award based thereon must be annulled. (27 Cal. Jur. 575 et seq.; 1928 Supp. thereto, p. 1619; and 1932 Supp. thereto, p. 1122 et seq.; and authorities there respectively cited.) On appeal from a judgment, a ruling which ever since its pronouncement has been consistently followed by the courts of this state, was made in the case of *Houghton* v. *Loma Prieta Lumber Co.*, 152 Cal. 574 [93 Pac. 377, 379], as follows:

''A finding against the great weight and preponderance of the evidence can be maintained on the doctrine of 'conflict' only where the alleged conflict rests upon evidence, either direct or circumstantial, *which so materially contradicts the testimony on the other side or is so radically inconsistent with it as to leave room in a fair and reasonable mind to find the fact either way.*''

See, also, *California R. E. Co.* v. *Walkup*, 27 Cal. App. 441, 447 [150 Pac. 385]; *Wenban Estate, Inc.*, v. *Hewlett*, 193 Cal. 675, 693 [227 Pac. 723]; *Gardiner* v. *Holcomb*, 82 Cal. App. 342, 350 [255 Pac. 523]; *Barton* v. *McDermott*, 108 Cal. App. 372, 380 [291 Pac. 591]; 2 Cal. Jur. 929; 1928 Supp. thereto, 179; 1930 Supp. thereto, 83.

In the case of *Smith* v. *Industrial Acc. Com.*, 26 Cal. App. 560, 563 [147 Pac. 600], it is said: ''The industrial accident commission exercises judicial functions; it sits as a court to try the matters pertinent to issues within its juris-

diction. There is every reason for saying, therefore, that *its findings should conform to and be judged by the same general rules as are applicable to findings made in courts of justice. . . . "* And the general rule has been applied in all its fullness to cases arising on review from awards made by the Industrial Accident Commission in the exercise of its jurisdiction. (*United States F. & G. Co.* v. *Industrial Acc. Com.*, 95 Cal. App. 186, 190 [272 Pac. 589]; *Thoreau* v. *Industrial Acc. Com.*, 120 Cal. App. 67, 73 [7 Pac. (2d) 767]. See, also, *General Acc. F. & L. Assur. Corp.* v. *Industrial Acc. Com.*, 186 Cal. 653 [200 Pac. 419].) The actual principle asserted is, that without evidence tending to prove that the disability or death proceeded from an industrial injury, the case presented cannot be a case within the jurisdiction of the commission.

▄▄ With so much authority for a review of the evidence upon which the award of the respondent commission depended, the question now arises as to its sufficiency. Reverting to the *résumé* of the testimony given by Dr. Rachmel relative to the possibility that, without first sustaining an injury, Baker *might* have contracted tuberculosis, and that owing to the inexactitude of the science of medicine, the theory that lowered resistance caused by the injury was the inducing cause of the disease of tuberculosis, became "purely speculative", nevertheless in the face of the positive testimony of the same witness, supported by the other evidence to which reference hereinbefore has been had, to the effect that the disease of tuberculosis, from which Baker died, was directly traceable to the injury sustained by him, —in accordance with the legal principles last hereinbefore set forth, this court is of the opinion that the assumed conflict in the evidence amounted to nothing more than a "mere pretense" (*Houghton* v. *Loma Prieta Lumber Co.*, 152 Cal. 574, 578 [93 Pac. 377]), and as such was insufficient to support the finding by the respondent commission in substance that, although Peter Baker died from pulmonary tuberculosis in an advanced stage, the said condition was not "caused by, aggravated or accelerated by his said injury of April 29, 1929".

That the theory of lowered resistance is recognized by the courts of this state as an inducing or predisposing cause of the disease of tuberculosis, is attested by the ruling in

the case of *Ensign* v. *Southern Pac. Co.*, 193 Cal. 311 [223 Pac. 953, 954], which in its general aspects, both as to physical facts and the testimony given by the attending physician, bears a close resemblance to the situation presented in the instant case. In the cited case, it also may be observed that on behalf of the defendant therein it was argued, as in effect is here argued, that "the verdict of the jury, with its implied finding that the death of the deceased proximately resulted from the injury caused by defendant rested, not upon the firm foundation of satisfactory evidence, but rather upon conjecture, surmise and speculation". Among other pertinent language employed by the court in rendering its decision, the following may be noted:

"It was not necessary for the plaintiff, in order to recover, to show that the tuberculosis was traumatic in origin. If, on account of the depleted and weakened condition of a person caused by an injury, he is rendered more susceptible to germs than if he had not been injured, or if, because of his debilitated condition, he is unable to resist the attack of germs present in his system, then the disease resulting from the germs is a natural sequence to his condition resulting from the injury and the injury is the proximate cause of his death and the disease is but one of the links in the chain of causation. (*Robinson* v. *National Life & Acc. Ins. Co.*, 76 Ind. App. 161 [129 N. E. 707] ; *Larson* v. *Boston Elev. Ry. Co.*, 212 Mass. 262 [98 N. E. 1048, 1050] ; *Crane El. Co.* v. *Lippert*, 63 Fed. 942 [11 C. C. A. 521] ; *Jones* v. *City of Caldwell*, 20 Idaho, 5 [48 L. R. A. (N. S.) 119, 116 Pac. 110] ; *Ohio & M. Ry. Co.* v. *Hecht*, 115 Ind. 443 [17 N. E. 297].)"

To the same effect, see the similar case of *Mullane* v. *Industrial Acc. Com.*, 118 Cal. App. 283 [5 Pac. (2d) 483].

██ But on behalf of the respondent commission herein it is asserted that the claim of the applicant for adjustment of compensation was barred because the death of Peter Baker did not occur within one year next following the injury, and not until more than one year and nine months after the last payment of compensation was made. (Subd. 2, sec. 11, Workmen's Compensation Act.) However, by the terms of the cited statute, in effect it is provided that proceedings for the collection of a death benefit may be maintained if commenced "within 240 weeks from the date

of the injury . . . when it appears . . . that the injury causing death also caused disability which continued to the date of the death and for which a disability payment was made. . . . '' Clearly, the facts of the instant case bring the situation thus presented within such provisions of the statute. The case of *Western Ind. Co.* v. *Industrial Acc. Com.*, 176 Cal. 776 [169 Pac. 663], is directly in point.

From the foregoing it necessarily follows that the award made by the respondent commission herein should be annulled. It is so ordered. It is further ordered that the cause be, and it is, remanded to the respondent commission for such action in the premises as may be fit and proper.

Conrey, P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 30, 1933, and an application by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 5, 1934.