## GREAT AMERICAN INDEMNITY CO. v. CARDILLO, Deputy Com'r, et al.
### No. 8139.

United States Court of Appeals for the District of Columbia.

Decided March 23, 1943.

Mr. Daniel W. O'Donoghue, Jr., of Washington, D. C., with whom Mr. Ross O'Donoghue, of Washington, D. C., was on the brief, for appellant.

Messrs. Ward E. Boote, Chief Counsel, United States Employees' Compensation Commission, and James E. McCabe, both of Washington, D. C., with whom Messrs. Edward M. Curran, United States Attorney, Bernard J. Long, Assistant United States Attorney, E. Willard Hyde, and Herbert P. Miller, Associate Counsel, United States Employees' Compensation Commission, all of Washington, D. C., were on the brief, for appellees.

Before GRONER, Chief Justice, and VINSON and EDGERTON, Associate Justices.

VINSON, Associate Justice.

This is an appeal from an order of the District Court dismissing an action to enjoin the enforcement of an award made by the appellee Deputy Commissioner under the compensation law effective in the District of Columbia.[1]

The Deputy Commissioner, Cardillo, awarded the appellee Lutton compensation for injuries sustained in the course of and arising out of his employment, directing the appellant, Great American Indemnity Company, and the appellee United States Casualty Company to make the compensation payments for temporary total disability jointly and equally during

[1] Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, 33 U.S.C.A. § 901 et seq., made applicable to the District of Columbia as a Workmen's Compensation Law, 45 Stat. 600, c. 612, § 1, D.C.Code 1940, § 36—501, 33 U.S.C.A. § 901 note.

the continuance of such disability or until otherwise ordered.

The sole issue is whether there was substantial evidence presented before the Deputy Commissioner to support his finding that the appellant, Great American Indemnity Company, is liable for one-half of the compensation payments awarded Lutton. We make the following summary of this evidence:

On October 14, 1939, Lutton, a foreman bricklayer, sustained an injury to his right great toe when a tile fell upon it. The toe was mashed and the flesh was pulled away from the toe nail. Within a day or two it became infected, discharging yellowish pus. Lutton continued to work; he did not secure medical treatment, but soaked the toe in warm salt solution at home. On October 25th, while working for the same employer and with the toe still inflamed and discharging pus, he suffered a second injury when a brick fell and hit the same toe. Thereupon he went to the Company doctor for treatment. He was under his care, receiving three or four treatments a week, until December 21, 1939. In this period the nail was removed. In November, 1939, Lutton complained of pain in both groins and, calling the doctor's attention to the pain, was advised to get a strap, or suspensory. This he did, and it gave him some relief. After the doctor discharged him, Lutton used an Epsom salts solution, kept the toe bandaged, and used a shoe with the toe cut out. The yellowish pus continued to discharge after December 21st. The home treatments ceased the latter part of January, 1940. Lutton worked, in the capacity of foreman, through this period.

Although he was not conscious of any further inflammation or pain in or about the toe after February, 1940, the toe was tender when he resumed the wearing of a regular shoe, and the man himself did not get well. His general health never regained its pre-injury status. Beginning with the infection, persisting through its duration and continuing through the spring and early summer of 1940, Lutton lost weight and suffered from chronic fatigue and inertia. During that time he made many statements to his wife that he felt he was going to have a sick spell. Although he never missed a day's work as foreman, he nevertheless was exhausted after the day's work and would take a nap, sometimes before dinner, at other times after dinner, before the usual bed-time. This inertia was described as a "loggy", "mopey", and "under par" feeling. He testified that prior to the injury he had seldom taken naps, but that after the injury he was continually taking them. All the evidence indicates that prior to the toe injuries Lutton had been a healthy and vigorous young man. At the time of the hearing he was thirty years of age. The debilitated feeling continued as described until the middle of July, 1940, when it was eclipsed by the more serious illness of which we will speak.

On June 26, 1940, a carbuncle appeared on Lutton's right shoulder, and drained for several weeks. For a week ending about July 4th he was running a temperature, and spent some time in bed from the carbuncle. On July 8th he returned to work for the same employer, not as a foreman bricklayer, but as a bricklayer, and was working on July 10th when, descending from a scaffold upon which he was working, he dropped to the floor, a distance of about three feet, suffering sudden and severe pain in the left hip. Lutton continued to work on July 10th and 11th. He went to the Company doctor for examination and treatment on July 11th. He worked until 2:30 p. m. on the 12th, and then went home and went to bed because of the hip injury. The pain became markedly worse and he was removed on July 15th to the hospital, where he was confined until September 19, 1940. At the hospital, treatment was rendered for injury to the left hip, and for staphylococcus septicemia. Thereafter he remained under continual medical care and treatment. An X-ray taken on November 29, 1940, disclosed a condition of osteomyelitis of the left pelvis and hip, and a residual condition known as osteoporosis.

The appellant was the insurance carrier for the claimant's employer during the period when the toe injuries were sustained, but did not occupy this relationship at the time the carbuncle developed. The appellee United States Casualty Company was the carrier when the carbuncle developed and at the time of the injury on July 10, 1940. Lutton made claim and was allowed the statutory compensation by the Commission, to be assumed in equal amounts by both insurance carriers. The causal relation between the carbuncle, the hip injury, the osteomyelitis and the osteoporosis is admitted, and thus is not in issue here. Our sole concern here is the

causal relation between the toe injury, the infection resulting therefrom, the continuing lowered resistance, and the appearance of the carbuncle. There is no dispute that the appellant is liable, as ordered, if this causal relationship is established.

The medical testimony was characterized by the customary divergence of expert opinion. There was a conflict, for instance, as to whether carbuncles are formed by the invasion of staphylococci through hair follicles or lesions in the skin, or whether they develop as a secondary infection from the bacteremic condition of the blood stream. Although there was competent medical evidence supporting both theories of carbuncular development, the appellant has attempted to capitalize on this conflict by means of a familiar sophistical device. It would have us consider each theory *separately*, and reject each, in turn, upon the basis that it cannot be established with absolute certainty that the carbuncle arose in that particular way. That there was protracted infection, however, and that there was uncontradicted evidence as to a marked lowered resistance in Lutton beginning very shortly after the first toe injury and continuing to the appearance of the carbuncle, cannot be questioned. Dr. Oscar Hunter, a pathological specialist, stated that, assuming the lowered resistance did play a part, *it made no difference, so far as concerned the causal relation,* whether the carbuncle was formed from *within* because of a continuing infection dating from the toe injury, or from *without* by penetration through hair follicles or other apertures in the skin. Dr. William P. Argy also seemed unwilling to adopt expressly one or the other of these alternative theories. Therefore, since there is no intimation of any reason for the lowered resistance other than the infection following the toe injuries, and no other explanation of the origin and development of the carbuncle is offered, we do not believe that it devolved upon the Deputy Commissioner to select expressly one or the other of these alternative theories as the link in the chain of causation. It was his obligation, as we see it, to consider only the actual result and the *general course* of the chain of causation which produced that result.

In a case of this character, all of the links in the chain of causation may not be perceptible. The links at each end present no difficulty: the positions of the toe injuries and the protracted infection at one end of the chain, and the temporary total disability at the other end, are not disputed. However, it is upon the latent quality of certain intermediate links that the appellant relies. It is urged that the course of the alleged chain cannot be supplied with detail from the time the local toe infection disappeared, in the latter part of January, until the carbuncle appeared in June following. But although the wound in fact healed over, a young, vigorous, previously healthy man did not get well with such healing. The evidence discloses a marked debility which continued up to and through the appearance of the carbuncle. While this part of the chain may have disappeared to the eyes of laymen, those skilled in the medical art may detect that which is obscured to the untutored eye. It is true that no one can point out an inch-to-inch progress, but with the assistance of experts the *general course* of the chain may be traced, even though there may be no precise detail as to the location of each link on a particular date, and although the experts may offer alternative routes in explanation of its trek through the human body. No greater degree of accuracy is required. The appellant did not demand such a certainty of course in respect of that section of the chain of causation which linked the carbuncle to the present temporary total disability. There, indeed, the links were admitted to exist, although they were no more reducible to exact positions than are the contested links with which we are dealing. The fact that the expert opinion as to the links before the carbuncle was not unanimous, as it was regarding the links thereafter, may detract from its weight as evidence, but it does not destroy its substantiality. As we see it, therefore, the only point in this case is whether there was substantial evidence presented to the Deputy Commissioner from which he could find that, in one or the other way, the toe infection contributed to the appearance of the carbuncle.

While the findings of the Deputy Commissioner may indicate a leaning toward the "within" theory of carbuncular development in this instance, he was justified in not expressly adopting one or the other of the contested medical theories. His findings as to legal causation were as follows: " * * * that the injury of October 14, 1939, was a contributing fac-

tor in the development of the said conditions; that the natural sequence of events, beginning with the injury to the right great toe, on October 14, 1939, is as follows: protracted period of infection of the right great toe, involvement of the lymph glands and nodes, general debility and lowering of resistance, carbuncle or abscess which developed in June, 1940, followed by a general bacteremia and the injury of July 10, 1940, which was super-imposed upon the said condition and precipitated osteomyelitis of the left hip and septicemia; that all of the said conditions are causally connected one with the other; * * *"

Was this finding supported by substantial evidence?

The circumstances of the toe injuries, the protracted toe infection, the debility and lowered resistance which followed, the carbuncle, the hip injury, and the subsequent illness were explained in detail in the presence of ten expert medical witnesses, only one of whom had examined Lutton before the osteomyelitis developed. Each doctor was then asked a hypothetical question to the following effect: In view of the evidence which you have heard, is it your belief that there was a "causal relation" between the toe infection and the carbuncle? Some of the doctors stated that they were of the opinion that there was no causal relation. Some of the doctors made more cautious replies. They stated that their conviction did not bear the degree of certainty which would permit a categorical answer. But they did state that the causal relation was "possible", "likely", "quite likely". Three of the experts testified that in their opinion there was a causal relation between the toe injuries and the admitted condition of the claimant. Dr. Matthew E. Donahue expressed the belief that staphylococcus organisms of the same type as were present in the toe infection remained in the blood stream from the time of the toe injuries, finally causing the development of the carbuncle. He based his belief that the causal relation existed "On the ground that the infection was of a chronic nature, long standing infection, that it lowered the man's general resistance and that * * * the carbuncle formed as the result of that lowered resistance." Dr. Argy testified that the osteomyelitis was causally related to both the toe injuries and the fall; that "* * * being a healthy man prior to this time [time of the toe injury], would lead one to believe something caused him to be under par and the only thing that has been brought out is that he had a low grade infection *which continued to lower his resistance to the point where he finally developed the carbuncle,* the carbuncle resulting in septicemia, the septicemia resulting in infection of the torn tissues in the left hip and the torn tissues resulted in osteomyelitis * * *." [Italics supplied]

Dr. Hunter stated: "Here is the way I see it: This man had an injury to his toe. He had suppurating perionyxis of the toe hanging on for a long time. He gives a history of going to sleep. Subsequently he develops a carbuncle and has another injury and comes down with osteomyelitis. While there was a period in between where we see no definite active infection we don't know whether or not these organisms may have been in his system, lying dormant as we frequently see them do and with an injury it breaks out."

In summary: There was testimony of a continuing progressive debility from the time of the infection to the appearance of the carbuncle. Three doctors testified that the infection caused the debility and lowered resistance, and that the carbuncle, in turn, resulted from the protracted infection and the lowered resistance. The Deputy Commissioner gave credence to this testimony. We cannot sit as re-appraisers of evidence. Our function is limited to determining whether the finding of the Deputy Commissioner is supported by substantial evidence. We find that there was such evidence.[2]

Affirmed.

2 Avignone Freres, Inc., v. Cardillo, 73 App.D.C. 149, 117 F.2d 385; Employers Liability Assur. Corp. v. Hoage, 67 App. D.C. 245, 91 F.2d 318; Baker v. Industrial Accident Commission of California, 135 Cal.App. 616, 27 P.2d 769; Bethlehem Shipbuilding Corp. v. Industrial Accident Commission, 181 Cal. 500, 185 P. 179, 7 A.L.R. 1180; Bratz v. Harry Maring, Jr., Inc., 116 Conn. 186, 164 A. 388; Seifman v. Ford Motor Co., 282 Mich. 342, 276 N.W. 472; Anderson v. Fisher Body Corp., 239 Mich. 506, 214 N.W. 938; Waite v. Fisher Body Corp., 225 Mich. 161, 196 N.W. 189; Bayne v. Riverside Storage & Cartage Co., 181 Mich. 378, 148 N.W. 412; Eicholz v. Niagara Falls Hydraulic Power & Mfg. Co., 68 App.Div. 441, 73 N.Y.S. 842, affirmed 174 N.Y. 519, 66 N.E. 1107; Tullis v. Rankin, 6 N.D. 44, 68 N.W. 187, 35 L.R.A. 449, 66 Am.St.Rep. 586.