OSA JOHNSON et al., Appellants, v. WESTERN AIR EX-PRESS CORPORATION (a Corporation) et al., Respondents.

OSA JOHNSON, Appellant, v. WESTERN AIR EXPRESS CORPORATION (a Corporation) et al., Respondents.

Leonard E. Thomas and John M. Schaupp for Appellants.

Joe Crider, Jr., Elber H. Tilson, George L. Greer, Jesse H. Steinhart and John J. Goldberg for Respondents.

WHITE, J.—On January 12, 1937, defendant Western Air Express Corporation (hereinafter referred to as Western Air Express) was operating an airline as a common carrier of passengers, mail and express between Salt Lake City, Utah, and Burbank, California, with an intermediate stop at Las Vegas, Nevada. Defendant United Airports Company of California, Ltd. (hereinafter referred to as United Airports Company), was at the same time engaged in operating an airport known as Union Air Terminal located at Burbank, California. Among the services furnished by the last-named defendant at said terminal to airlines and airplanes was that of maintaining and operating, under and through an agreement with airlines operating in the vicinity of Los Angeles, California, and with

the consent and authorization of the Department of Commerce and the Federal Radio Communications Commission, a radio control tower and station (hereinafter referred to as radio station KBLA), with radio voice transmission facilities and likewise a radio "localizer beam" station to provide local radio beams for the purpose of guiding and assisting airplanes in landing at said Union Air Terminal. On the day here in question an agent and employee of defendant United Airports Company was in sole and exclusive charge of the radio control tower and of KBLA radio localizer station.

On the morning of January 12, 1937, Martin E. Johnson and his wife, Osa Johnson, engaged passage from defendant Western Air Express at Salt Lake City, Utah, for an airplane trip to Burbank. Accordingly, Mr. and Mrs. Johnson were assigned space on an airplane known as a Boeing 247 airliner, carrying ten passengers and a crew of three employees of defendant airline company, together with certain mail and express, on what was designated as "trip No. 7". Included in the aforesaid employees of defendant Western Air Express were defendant William W. Lewis, pilot of said airplane, and Clifford P. Owens, copilot, both of whom were rated pilots under the Department of Commerce, and likewise possessed so-called airline and instrument ratings. The plane in question was equipped with two motors and was supplied with all necessary flying instruments and gauges, including what are commonly referred to as primary blind flying instruments and secondary blind flying instruments. The plane was also equipped with three radio receivers and a radio transmitter, together with a carburetor de-icer and propeller de-icers. It is conceded that at no time on the trip was any mechanical failure or trouble encountered with the motors or the airplane itself.

The evidence reveals, in substance, that methods and types of flying are divided into two classes—contact flying, which is the type done by a pilot when visibility is good and he can visually observe the terrain around him; and instrument flying, which is the type of flying done by a pilot while he relies solely upon the reading of the instruments before him in the cockpit, and which mechanisms are known as the primary blind flying instruments and secondary blind flying instruments, together with radio directional guides. When he resorts to instrument flying it is normally unnecessary for the

pilot to have visual recourse to conditions outside the cockpit because he can depend exclusively upon the instruments on the instrument board in front of him and the radio advices he receives through his earphones. In the instant case, the flight from Salt Lake City to the intermediate stop at Las Vegas was made by contact flying on the part of the pilots and was uneventful. At Las Vegas the plane was held for 33 minutes by the chief dispatcher of defendant Western Air Express at Burbank "until he had checked the weather reports and decided whether he should let the plane continue to Burbank". At 9 o'clock pilot Lewis was directed to proceed to Daggett, California, where he would receive further instructions from the aforesaid chief dispatcher. Upon arrival at Daggett, pilot Lewis communicated with the Western Air Express ground station at Burbank by radio and "gave them his estimates", that is, advised that he would be over Palmdale at 10:40 a. m. and would arrive at Burbank terminal at 11:05 a. m. At the same time pilot Lewis "requested instrument clearance into Burbank", that is to say, he requested authorization and approval of his plan to make an instrument approach and entry into the Burbank airport. The Western Air Express operator radioed the pilot between 10:15 and 10:25, giving the latest weather reports at Palmdale, Saugus and Burbank. These reports also advised the pilot of an estimated ceiling at Burbank of 1,500 feet (the ceiling being the distance from the ground to the base of the clouds or overcast); Palmdale was reported as having a 2,000-foot ceiling, with light snow. The ceiling prevailing at Saugus was estimated by the radio operator as 800 feet, with light rain. The terminal dispatcher also approved the pilot's request to make an instrument approach and authorized and instructed him "to fly an instrument problem into Burbank". The term "instrument problem" had reference to the "procedure to land down through with aid of radio range"; which procedure had been adopted by defendant Western Air Express with the approval and authorization of the Department of Commerce. (Paragraph 190, section 7, chapter 8, Air Commerce Regulations governing scheduled operations of interstate airline service in effect at the time pertinent hereto.)

A radio range station sends out a beam signal in four directions. The space between two beams is termed a quadrant, there being two "A" and two "B" quadrants. When a pilot whose radio is tuned to such a station is "on the beam",

that is, flying on the course of the directional signal, either directly toward or directly away from the station, he will hear a steady hum in his earphones. If while so tuned in he strays off the course into the "A" quadrant, he will hear the International Morse Code signal for "A"—a dot followed by a dash. If he wanders to the other side he will hear the signal for "N"—a dash followed by a dot. By the "cone of silence" is meant that area immediately above the radio station. When a pilot flies along a radio beam toward a station the signal becomes continuously louder in his earphones until he passes into the "cone of silence", when all signals cease; when he reaches the other side of the cone of silence the signal returns.

With respect to a pilot approaching Burbank on instruments from the Saugus area, the approved "procedure to land down through" provided: "Pilots approaching this station will maintain an altitude of not less than 5500 feet above sea level pending definite location of the radio range station. Planes arriving from the northeast will follow the Palmdale leg of the Saugus Radio Range, magnetic course 221 degrees —to the cone of silence. After definitely determining the cone of silence and noting the change of signal in quadrants, pilot will proceed out the Bakersfield leg, magnetic course 316 degrees, at an altitude of not less than 5500 feet above sea level for approximately two minutes, during which time he will lower wheels, place propellers at low pitch and set throttles for an air speed of 120 M. P. H. He will then reverse direction, course 136 degrees, and again pass through the cone of silence at 5500 feet above sea level. After passing cone of silence and checking change of signal in quadrants, he will start letting down on the San Diego leg, magnetic course 125 degrees, *remaining on the beam,* rate of descent 525 feet per minute, air speed 120 M. P. H. *At the end of two minutes* altitude should be about 4500 feet indicated and the long-wave receiver shifted to 278 kilocycles which should bring in the localizer at Union Air Terminal (station KBLA at Burbank). At the end of four minutes, after passing through cone of silence at Saugus, altitude should be about 3400 feet indicated. At the end of six minutes, altitude should be about 2300 feet. At the end of eight minutes, altitude should be about 1200 feet, at which time the lowest allowable altitude will soon be reached and the plane flown on in to the cone of

silence at the minimum altitude if the ground has not been sighted. After passing through cone of silence and no sight of ground is visible, the pilot will pull up in a right turn, getting on top for another approach.''

Following the last-mentioned radio communication, pilot Lewis continued his flight to the vicinity of Palmdale, California, still flying by contact, and was able to see the ground and the flying field at Palmdale. When he arrived over the last-named place he had a further radio communication with Western Air Express ground station at Burbank, at which time he gave definite estimates as to when he expected to arrive over Saugus and into Burbank. At this time pilot Lewis was further advised that the ceiling at Burbank was about 3,000 feet, with a lower stratum of clouds at 1,500 feet around the east hills. Pilot Lewis radioed back to Western Air Express dispatcher's office that he would be over the cone of silence at Saugus at 10:50, would make the return or second trip across the cone of silence at 10:57, and would be in Burbank at 11:06. The trip between Palmdale and Saugus was made flying at an altitude a little in excess of 7,000 feet, and on top of the clouds or fog. In accordance with the aforesaid approved ''procedure to land down through with aid of radio range'', pilot Lewis followed the Palmdale leg of the Saugus beam until he came to the cone of silence at Saugus, which he crossed, exactly as he had predicted, at 10:50. After ''hitting the cone of silence'', pilot Lewis continued until he got what is called the ''build-up'' or return of signals in his earphones on the other side of the cone, whereupon he made, as he was required to do, a right turn to go out along the Bakersfield leg of the Saugus beam, which runs northwesterly from Saugus. He then radioed the ground station of Western Air Express, stating that he had passed the Saugus cone of silence and would repass it at 10:57 and arrive in Burbank at 11:06. It might here be stated that as the pilot nosed the plane down to the 5,500-foot level, he encountered considerable turbulence and ''icing conditions'', but he was nevertheless able to maintain his course on the Bakersfield leg of the beam, make his turn, and again pass over the cone of silence at 10:57.

The route from the Saugus radio range station (elevation 1,100 feet above sea level) to the Burbank airport (airline distance approximately 17 miles) lies in a general southerly direction through Newhall Pass, between the San Gabriel Moun-

tains on the left and the Santa Susanna Mountains on the right. The highest point in the pass is 3,000 feet above sea level. In the center of the pass was located an airline beacon light at an elevation of 2,040 feet. It was while en route from Saugus to Burbank that the plane went approximately three miles off its course to the left, or east, in connection with which we shall have more to say later in this opinion. Upon the pilot's being advised that he was off his course, and while he was attempting to regain his position thereon, the plane crashed on Los Pinetos Peak in the San Gabriel Mountains, at an elevation of approximately 3,550 feet.

As a result of the accident plaintiff Mrs. Johnson sustained severe personal injuries and her husband was killed. Two lawsuits are involved in this appeal. One is a cause of action by the surviving heirs at law, namely plaintiff Osa Johnson and a surviving sister, Freda Cripps, under the provisions of section 377 of the Code of Civil Procedure, for the death of Martin E. Johnson as a result of the airplane crash, allegedly caused by the wrongful act or neglect of the defendant corporations and their employees. The other is a cause of action filed solely by the plaintiff Osa Johnson to recover damages for her own personal injuries sustained in and arising out of the same airplane accident.

By their answers defendants denied negligence, and in both cases the answers of Western Air Express set up affirmative defenses of inevitable and unavoidable accident and act of God. The two causes were consolidated for trial, during which trial the actions were dismissed as to all individual defendants. Following such trial the jury returned verdicts in each action in favor of the remaining corporate defendants. From the judgments entered on such verdicts plaintiffs have appealed, and present both appeals upon a single transcript and one set of briefs.

Appellants first urge a reversal of the judgments on the ground that the court committed prejudicial error in making its order, over their objection, consolidating the two cases for trial. This claim is grounded on the contention that such order militated against the material and substantial rights of the plaintiffs and therefore constituted an abuse of the discretion vested in the trial court to make an order of consolidation. (Code Civ. Proc., sec. 1048.) In this connection it is claimed that in the action brought pursuant to section 377 of

the Code of Civil Procedure no evidence was either proper or admissible touching upon the earning capacity or financial condition of plaintiffs, while in the action brought by Mrs. Johnson individually to recover damages for her personal injuries, loss of earning capacity and other detriment suffered by her as a result of the crash, it was required that evidence be given as to her earning capacity, actual earnings and financial condition for the purpose of determining the extent of the damage, if any, sustained by her as alleged in the complaint filed in her individual action. Such evidence, it is argued, would necessarily tend to prejudice the right to recover on the part of the heirs-at-law in the action brought under the aforesaid statutory provision, in which action such evidence of financial condition was inadmissible. ▮ Undoubtedly it is the established law in California that in an action instituted by the heirs-at-law under the provisions of section 377 of the Code of Civil Procedure, evidence of the financial condition as to either poverty or affluence of such heirs-at-law is clearly immaterial and inadmissible. ▮ The measure of damages in such case is what the heirs were receiving at the time of the death of the deceased and what such heirs would have received had decedent lived. It is the destruction of their expectations in this regard that the law deals with and for which it furnishes compensation. (*Shebley* v. *Peters,* 53 Cal. App. 288, 293 [200 Pac. 364] ; *Mahoney* v. *San Francisco & S. M. Ry. Co.,* 110 Cal. 471 [42 Pac. 968, 43 Pac. 518] ; *Gilmore* v. *Los Angeles Ry. Corp.,* 211 Cal. 192 [295 Pac. 41] ; *McLaughlin* v. *United R. R.,* 169 Cal. 494 [147 Pac. 149, Ann. Cas. 1916D, 337, L. R. A. 1915E, 1205] ; *Ensign* v. *Southern Pac. Co.,* 193 Cal. 311 [223 Pac. 953] ; *Wright* v. *Broadway Dept. Store,* 199 Cal. 562 [250 Pac. 572].)

▮ By section 1048 of the Code of Civil Procedure it is provided that in its discretion the court may direct the consolidation of actions whenever it can be done without prejudice to a substantial right. In the instant case we perceive no showing of an abuse of the court's discretion, nor of any prejudice to the substantial rights of the parties because of the court's action in directing a consolidation of the two cases. Both arose out of the same accident; witnesses in both were the same; as was the testimony, except so far as the latter pertained to the financial condition of the parties, which last-mentioned issue became material only in Mrs. Johnson's indi-

vidual action for personal injuries and consequent damage. However, the trial court painstakingly and clearly instructed the jury concerning the evidence they were to consider in each of the two cases, as is evidenced by the following instructions:

"Two entirely separate cases are submitted to you for decision on the facts. One, Cause No. 422944, concerns the claim for damages of Osa Johnson as the surviving widow and Freda Cripps as the surviving sister of Martin E. Johnson for the death of Martin E. Johnson on January 12, 1937, while he was riding in an airplane owned and operated by the defendant Western Air Express Corporation, on a trip from Salt Lake City, Utah, to Burbank, California. The other case, No. 423,449, concerns the claim of Osa Johnson for damages for personal injuries claimed to have been suffered by her on the 12th day of January, 1937, while riding in the same airplane owned and operated by the defendant Western Air Express Corporation, on a trip from Salt Lake City, Utah, to Burbank, California.

"If you find that the plaintiffs in Case No. 422944 are entitled to a verdict from one or both of the defendants, *then you will proceed to assess the damage in that case as though Case No. 423449 had not been filed or brought to your attention and as though you had heard no testimony whatever in respect to the earning power or want of earning power of the heirs Osa Johnson and Freda Cripps since the death of Martin E. Johnson or of their financial dependence or financial independence. In other words, the fact, if it be a fact, that Osa Johnson has earned since the death of her husband Martin E. Johnson, or is capable of earning amounts large or small cannot and must not be considered by you in assessing the damages in Cause No. 422944.* This is for the reason that the law which you must follow specifically provides that an heir is entitled in an action for wrongful death to the pecuniary loss suffered and that amount is not to be reduced or enlarged by reason of the financial condition of the heir or heirs.

"If you find that Osa Johnson, the plaintiff in Case No. 423449, is entitled to a verdict from one or both of the defendants then you will proceed to assess her damage in that case as though case No. 422944 had not been filed or brought to your attention and as though you had heard no testimony in respect to the earning power of Martin E. Johnson or the

value or lack of value of the estate, if any, left by him. In other words, in assessing the damages in her individual case you will neither increase nor decrease them because of the knowledge you may have of the character just mentioned nor because of the amount you may award in Cause No. 422944.''

The following language taken from *Douglas* v. *Southern Pacific Co.*, 203 Cal. 390 [264 Pac. 237], is here most pertinent and decisive: ''Jurors are presumed to be persons of common intelligence and capable of comprehending the ordinary use of language. . . . We will not assume that they may not have understood the charge as we understand it.'' In view of the clear and unequivocal instructions of the court, we cannot agree with appellants that the jury was misled by opposing counsel's argument based on the financial status of Mrs. Johnson. Such argument was proper in connection with her individual action for damages based on personal injuries allegedly sustained by her. Furthermore, the jury was admonished in plain and understandable language that they were not to consider the question of damages unless they first determined the existence of a liability for damages on the part of the defendants.

 Appellants next complain of the action of the trial court in submitting the causes to a jury after plaintiffs, prior to the commencement of the trial, waived trial by jury theretofore demanded by them. Immediately upon receipt of notice from plaintiffs' counsel that a jury had been waived, defendants, on the day before the commencement of the trial, deposited the requisite jury fees and demanded a jury trial. On the day of the trial plaintiffs moved the court for trial without a jury, which motion was denied. Appellants' contention that respondents had at least impliedly waived a jury by not demanding one within the time required by law cannot be sustained. There is creditable authority for the statement that the purpose of section 631 of the Code of Civil Procedure is to grant the parties the right to waive a jury trial, but not to make such waiver irrevocable. (*Duran* v. *Pickwick Stages System*, 140 Cal. App. 103 [35 Pac. (2d) 148].) Neither does any presumption exist that prejudice resulted from a trial by jury. From a very early date it has been held that notwithstanding such waiver the court has a right to direct that an issue of fact be submitted to a jury. (*Doll* v. *Anderson*, 27 Cal. 248, 251.) Notwithstanding that

a jury was waived by defendants in accordance with the statute, it is within the discretion of the trial court to disregard such waiver and try the case with a jury. In the instant cause we find no grounds for disturbing the exercise of the discretion with which the trial court was clothed.

We come now to a consideration of appellant's claim that the evidence is insufficient to justify the verdicts, in that undisputed negligence and negligence as a matter of law, constituting the proximate cause of the accident, was proved and admitted upon or by the pilot, the copilot, the dispatcher and the radio operator of defendant Western Air Express, and against the agent of the defendant United Airports, and that the affirmative defense of Western Air Express that the accident occurred because of an act of God was not established by the defendants.

A review of the evidence indicates without contradiction that up to the time the pilot passed the cone of silence at Saugus the first time, he had encountered no trouble. His optimistic frame of mind is reflected by the fact that when he originally passed the cone of silence he radioed the station, giving his estimate that he had passed the cone at 10:50 a. m., would repass it at 10:57, and arrive at Burbank at 11:06. As the pilot himself testified, "That conversation was not necessary, but I felt good that day, and everything was clicking, so I just radioed that in." At that time the station replied that "the weather was the same". At this time the pilot's compass was straight along the beam, and as he came upon the cone the first time his elevation was 7,150, his radio was on, and "working nicely and clearly". After first passing the cone of silence he proceeded out on the Bakersfield leg and started to let down into the overcast. According to the pilot's testimony, immediately upon entering the overcast he encountered ice, and the ship started tossing, rolling and vibrating, but, as he testified, he had the plane under control. He nosed it down to the 5,500-foot level, maintained his course on the Bakersfield leg, made his turn and again passed over the cone of silence at 10:57, exactly as he had predicted. At the time he encountered ice the pilot directed the copilot to turn on the de-icers, but the latter did not do so, and admittedly the pilot was aware of that fact. In describing the performance of the plane just before he came to the cone of silence for the second time, the pilot testified: "The ship just sunk.

. . . Sunk with what we commonly call a downdraft.'' It should here be noted that just as he passed over the cone of silence the second time and got the ''build-up'' (meaning a return of signals), he switched off his radio from the Saugus station beam. What then transpired is thus described by the pilot in his testimony:

''Well, I immediately got busy and started adjusting the stabilizer and, as I say, I was lucky enough to cross the cone of silence, and I glanced at the watch at 10:57 and got the other side of the cone and switched over and tuned into KBLA and heard KBLA—I heard KBLA's voice, and I thought that was great. I hauled on the airplane, and what was my reward? It was 80 miles an hour and the airplane sinking, the throttles were open and no power. I watched those 'tachs' go back and forth; I shoved the thing down to regain speed, because I knew I couldn't hold altitude at 80 miles an hour, and the ship sinking. I pulled back on the throttles, and I was hoping to get the ice broke out of the carburetors. I adjusted the automatic pitch control, I was trying to fly the ship right side up. I glanced over at my watch. KBLA was still talking, and I knew I was faced with an emergency. I told the copilot to tell KBLA to shut up, and for some reason he didn't hear me. I grabbed the mike. I told KBLA, 'Hey, somebody tell KBLA to shut up.' Well, my decision was trying to get back, but try to get back! I knew what I had passed through. I was plenty depressed at this point, wondering what had happened to the ground crew, did they run out on me? I was wondering if they thought they had a superhuman in that cockpit. Well, my decision was to go on. The beam came on, and I heard the 'N'. (Meaning, as heretofore indicated, that he was off his course to the left.) Of all places I didn't want to be was the 'N'. I made a turn, and I looked back to see how much ice there was on the airplane, and what did I see—two bushes. I pulled back on the throttles and grabbed that wheel—that was all—that was all. . . . KBLA was talking all about my trip, and they were expecting me any moment. And it seems to me that I recall them saying I would be in there at 11:06. I was all over the cockpit, and I didn't catch everything they said. Things were going bad, and from bad to worse, at that point. . . . Q. Will you please tell us approximately how long they kept talking? A. Well, after I was wrestling around with this ship, and being buffeted all over, and trying to keep a safe

air speed, and trying to break the motors loose, I glanced at the watch and it was 10:59. Q. So it was a period, then, of two minutes that you heard KBLA, would you say? A. That is correct. . . . Q. Now, when you had turned over to the KBLA frequency and were waiting for the beam, the KBLA beam, why didn't you call in to them? Will you just tell us? A. Mr. Hanson, I was all over the cockpit, and when I heard their voices I thought that was great, here is the beam. I thought I was getting some relief then. I looked at those motors, and the tachometers were just barely putting out, and when I looked at that air speed and saw that falling, and the airplane sinking. . . . ''

In the course of his testimony the pilot admitted that when he switched off the Saugus station beam he was depending upon an ''average'' compass reading to guide him on his course, because as he testified, ''I had to make an average of it because the ship was tossing and rolling, the whole thing was just vibrating like that, and it was tossing and rolling.''

The only other survivor of the crash who testified as a witness at the trial was plaintiff Mrs. Osa Johnson. In substance, she testified that after the plane left Saugus ''we got into very bad weather . . . the plane was doing all sorts of funny things . . . it was all over the sky in other words . . . We seemed to be going down in the plane like a dive . . . it was just sort of all over, like being in a terrible rough boat or something . . . ''; that the weather was ''very very bad''. Asked to describe in her own words the movements of the plane for a period of two or three minutes immediately preceding the crash, Mrs. Johnson testified, ''As I said, he (the pilot) throttled back the motors and was gliding in just a few minutes before, a very few, and I remember praying to God that we would hit the airport.''

It therefore devolves upon us to determine whether there is in the record evidence to support the implied finding of the jury that the pilot and copilot were free from negligence, or that no negligence, if any, on their part, proximately contributed to the crash. We think there was material evidence offered to support the verdicts of the jury, and of course if there was, under the well established rule the judgments must be affirmed. It was a question of fact for the jury to determine, and not a question of law, whether the pilot was guilty of negligence in abandoning the Saugus beam and flying on

an average compass reading, and in consideration of this question they were entitled to consider that during all of his difficulties the pilot was trying to hold to a compass course of 125 degrees, because, as he testified, he knew that was the compass course which would lead to the Burbank airport.

■ Whether the failure of the pilot to do the exact things provided in the "procedure to land down through with aid of radio range" was a proximate cause of the accident was a question of fact for the jury to determine in the light of existing conditions. Respondent Western Air Express concedes that if conditions had been normal and pilot Lewis had been able to follow each step of the "procedure" and had simply failed to do so, with the resultant crash and no explanation for its occurrence, there would be no question whatsoever but that the accident was due to the negligence of the pilot; but respondent contends, and its contention must be upheld, that it was for the jury to determine whether the pilot, in the exercise of the highest degree of care, was unable to do the things required by the "procedure" because of an act of God (Civ. Code, sec. 3526); and further, that it was within the province of the jury to conclude that the pilot's failure to remain tuned to a beam under the facts and circumstances present was not the proximate cause of the crash and that unusual conditions of icing and turbulence were such that the pilot could not have followed a beam because the combination of ice in the carburetors and extreme air turbulence made it impossible for the pilot to control the plane either as to course or altitude. The testimony of both the pilot and plaintiff Mrs. Johnson herself furnished grounds upon which the jury could predicate a finding that the disaster occurred by reason of the unusual forces of nature, and was one which could not have been reasonably anticipated, guarded against or resisted; that the crash was occasioned by the violence of the elements alone, and that the agency of man had nothing to do therewith.

■ Appellants' contention that an absolute inference of negligence must be predicated upon the failure of the copilot to turn on the de-icing equipment when ordered so to do by the pilot cannot be upheld. We are without authority to disturb the implied finding of the jury that the failure to utilize the de-icers was not the proximate cause of the crash, because there is creditable evidence in the record to show that the propeller de-icers when in operation do not remove ice already

formed on the propellers, at least not for an appreciable period, and that the primary function of such mechanism is to prevent ice from forming if the de-icers are operated before ice has formed. The testimony in the case at bar indicates that immediately upon the plane's entering the overcast the ice formed on the propellers.

Appellants' contention that dispatcher Whitney was guilty of negligence as a matter of law cannot be sustained. The qualifications of Mr. Whitney as a competent aircraft dispatcher were established. Appellants assert that the dispatcher was negligent in not advising the pilot of the receipt by the dispatcher of the United States Weather Bureau teletype reports at 9:41 and 10:41 a. m., notwithstanding that at 10:50 a. m. the pilot radioed into the Western Air Express dispatching office informing them he had just passed the cone of silence at Saugus for the first time. In this regard appellants contend that from such meteorological information and data, it was reasonable for the dispatcher to anticipate that freezing and icing conditions were present some place in the overcast above Saugus. However, we find in the record no evidence that the weather reports in question were indicative of an existing condition that should have aroused the apprehension of or caused alarm to dispatcher Whitney. Neither does the evidence indicate a causal connection between the failure to transmit such weather report and the crash. Therefore the jury was justified in so finding. In other words, there is no showing in the evidence that had such weather reports been transmitted to the pilot the accident would not have occurred, or that the pilot would not have gotten off his course. Neither do we feel that negligence upon the part of dispatcher Whitney can be inferred from his failure to request KBLA to furnish the localizer beam until after it was requested by the pilot at 11:01 a. m. From the record before us we must agree that the jury was warranted in concluding that no such obligation devolved upon the dispatcher, and that such request should emanate from the pilot. What we have just said is equally applicable to the claim that radio operator Hoorn was guilty of negligence as a matter of law. He testified that the making of such request devolved upon the pilot, and it was therefore the function of the jury to determine whether the pilot should have requested the beam,

as well as what would have ensued if he had made such request.

Appellants next assert that the trial court erred in certain of its rulings made during the trial. In this connection it is claimed that the court sustained objections to testimony of plaintiff Mrs. Osa Johnson concerning the actual maneuvers of the airplane while flying in the overcast and prior to the occurrence of the crash. This contention is not borne out by the record, which indicates that the witness was permitted to testify as to the actual motions made by the plane as the same were experienced by her, as is evidenced in one instance by the following answer: "Well, the plane just went down like that and came up and nosed and dropped several hundred feet." When, however, she was interrogated as to the maneuvers of the plane which were allegedly occasioned by the operative conduct of the pilot, such as that he "throttled back the motors and dived", and as to the plane "stalling", objections were properly sustained and motions to strike correctly granted, for the reason that no proper foundation was laid to show that the witness could see the pilot, she being back in the cabin of the ship and the pilot being in the cockpit with the door closed between them. True, Mrs. Johnson was an experienced pilot, and as appellants contend may have been qualified as an expert, but she was not such in the operation of planes of the type and design of the one involved in the accident here in question. Therefore the question of whether she was qualified to give her opinion as evidence in the matter in issue was one for the decision of the trial judge in the first instance, and the qualifications of the witness are to be determined by the trial court before such opinion may be given. (*Fairbank* v. *Hughson,* 58 Cal. 314.) It is in itself in the nature of a trial of a question of fact by evidence addressed to the judge alone, and as on other decisions on questions of fact by a trial judge, his ruling thereon is a matter of discretion and will not be overturned on appeal unless there was an actual want of evidence to support it or a clear abuse of discretion in ruling upon the evidence given on the subject. (*Howland* v. *Oakland etc. Co.,* 110 Cal. 513, 521 [42 Pac. 983] ; *Mabry* v. *Randolph,* 7 Cal. App. 421, 427 [94 Pac. 403].) If there is any substantial evidence to support the ruling of the trial court, it will be upheld. If the court had decided to admit the expert testimony here in question, such decision would in like manner be

sustained. There being in the record evidence to support the ruling of the trial judge, and perceiving no abuse of discretion in such ruling, we cannot say that it was sufficiently prejudicial to warrant a reversal. (*Rudat* v. *Carithers,* 137 Cal. App. 92, 97 [30 Pac. (2d) 435].)

Testimony offered as to what was customary in connection with the ''procedure to land down through with aid of radio range'' was properly excluded. The issue before the court involved the conduct of respondents and their employees on the particular occasion in question. The same is true of the interrogatories calling for the custom among pilots as to whether or not they would call for the localizer when they were on the instrument approach. We perceive no prejudicial error in the other rulings of the court on the admission or exclusion of evidence to which exception is taken.

We have painstakingly read the instructions given, and particularly those to which exception is taken, and conclude that when considered as a whole the instructions fairly and correctly advised the jury of the rules of law applicable to the issues presented by the pleadings and raised by the evidence. Regarding appellants' complaint concerning the instructions given and claimed to be erroneous on the doctrine of *res ipsa loquitur*, it may well be said that at no time during the trial did plaintiffs rely on the *res ipsa loquitur* doctrine, but on the contrary asserted by their pleadings and presented by their evidence several acts of ''specific negligence'' on the part of defendants and their employees which allegedly caused the crash. The instructions complained of dealt with this phase of the case and not with the doctrine of *res ipsa loquitur*. Furthermore, appellants made no request of the court to instruct the jury upon such doctrine, and manifestly did not rely upon it. Appellants' entire case is predicated upon claimed and stated specific negligence of the pilot and other employees as hereinbefore narrated.

We come now to a consideration of that phase of the appeal which concerns respondent United Airports Company. Concededly this respondent did not undertake to nor did it transport any passengers riding in the plane operated by its codefendant, Western Air Express. Appellants insist that liability rests upon United Airports by reason of the latter's failure to supply a radio localizer beam to the Western Air Express plane for instrument approach to the airport at such

times as the same was requested. We find in the record no evidence that respondent United Airports failed to supply such beam, and certainly the record is devoid of even a scintilla of evidence that such beam was ever requested and refused. Moreover, there is nothing in the pleadings or evidence to indicate that the giving or failure to give such beam in any way caused the airplane, as contended by appellants, "to depart from its position of safety". The burden rested upon plaintiffs to show that the alleged negligent omissions or acts on the part of defendant United Airports Company were an efficient cause from which the injury complained of followed in a natural and continuous sequence, unbroken by any efficient intervening cause. In the case at bar the evidence fails utterly to show that any negligence on the part of respondent United Airports Company caused or contributed to the accident and consequent injury. The judgment in favor of such respondent must therefore be upheld.

The attempted appeals from the orders denying plaintiffs' motion for a new trial are dismissed. The judgments are affirmed.

York, P. J., and Doran, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied August 28, 1941. Shenk, J., Curtis, J., and Carter, J., voted for a hearing.

[Civ. No. 12477. Second Dist., Div. One.—June 30, 1941.]