[S. F. No. 10254.    In Bank.—February 16, 1924.]

HEMAN B. ENSIGN, as Administrator, etc., Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

[1] NEGLIGENCE — ACTION FOR DEATH — INJURY TO BACK — DEVELOPMENT OF TUBERCULOSIS—PROXIMATE CAUSE—FINDINGS—EVIDENCE. In this action against a railroad company for damages for death alleged to have resulted from an injury to deceased's back sustained while loading heavy pipes in a railroad car which was jarred by the impact of empty box-cars against it, the jury were justified under the evidence in arriving at the conclusion that the back of the deceased was wrenched; that as a consequence he suffered pain with attendant loss of sleep which resulted in a lowering of his vitality; that by reason of his weakened power of resistance he became the prey of tuberculosis; that as a result a rectal abscess, tubercular in origin, developed, which

———

1. Extent and character of development following personal injury for which person inflicting the injury is liable, notes, 16 L. R. A. 268; 48 L. R. A. (N. S.) 119.

necessitated an operation which resulted fatally; in other words, the jury were justified in finding that the ultimate result could be traced through successive stages to the original injury, and that the responsibility rested upon the one who put in operation the chain of events which resulted in the death of the deceased.

[2] ID. — INJURY AFFECTED BY TUBERCULAR CONDITION — PROXIMATE CAUSE—CHAIN OF CAUSATION.—In such action, it was not necessary for the plaintiff, in order to recover, to show that the tuberculosis was traumatic in origin. If, on account of the depleted and weakened condition of a person caused by an injury, he is rendered more susceptible to germs than if he had not been injured, or if, because of his debilitated condition, he is unable to resist the attack of germs present in his system, then the disease resulting from the germs is a natural sequence to his condition resulting from the injury and the injury is the proximate cause of his death and the disease is but one of the links in the chain of causation.

[3] ID.—DATE OF ACCIDENT—AMENDMENT OF COMPLAINT—DISCRETION. In such an action, it was properly within the discretion of the trial court to permit an amendment of plaintiff's complaint changing the date of the alleged accident, where the trial of the case took place some five years after the accident, and considering the nature of the accident, which at the time appeared to be trivial, it was quite natural that the exact date of the injury should not have been retained in the minds of the witnesses, and there was no question but that the car in question was loaded by the deceased and his helper, as alleged in the complaint.

[4] ID.—TREATMENT OF DECEASED—ADVICE AND OPINIONS CONCERNING—TESTIMONY OF WIFE OF DECEASED—INADMISSIBILITY OF.—In such an action, testimony given by the wife of the deceased, over defendant's objection, as to the opinions and advice of others as to the proper treatment of her husband, was hearsay; and while, perhaps, no single instance narrated in such testimony could be said to be seriously prejudicial, nevertheless the frequency and persistency with which this testimony was iterated and reiterated could not fail to make a substantial impression upon the minds of the jury adverse to the defendant's case.

[5] ID.—DECLARATIONS OF DECEASED—HEARSAY EVIDENCE.—In such action, declarations made by the deceased, as testified to by the father-in-law of the deceased, concerning the condition of his

2. Aggravation of latent or dormant disease of person by negligent act as bearing on question of proximate cause, note, **Ann. Cas.** 1915B, 201.

5. How near the main transaction must declarations be made in order to constitute *res gestae,* note, 19 **L. R. A.** 733.

back, which were made several hours after the accident, were hearsay, and, not constituting any part of the *res gestae,* did not fall within the exception to the hearsay rule.

[6] ID.—EVIDENCE—INADMISSIBILITY OF BOOK KEPT BY DECEASED.—A book marked "day," purporting to be a memorandum kept by the deceased, showing an account between himself and his father, was inadmissible in such action for the purpose of showing that certain medicine, which a witness for the defense had testified he had delivered to the deceased prior to the injury, was bought by the deceased and charged to his father.

[7] ID.—POVERTY OF DECEASED—RECEPTION OF EVIDENCE—ERROR NOT CURED BY INSTRUCTION.—In such an action, error resulting from the testimony of the wife of the deceased to the effect that the latter was unable to take certain treatments because of the fact that he had no money and that everything he owned was mortgaged, cannot be said to have been cured by a general instruction to the effect that the pecuniary circumstances of the plaintiff or the heirs of the deceased could not increase or diminish the amount of damages which the plaintiff was entitled to recover, if entitled to recover at all, especially where the trial court refused to strike out the wife's testimony.

[8] ID.—POVERTY OF INJURED PERSON—EVIDENCE OF PREJUDICIAL.—It cannot be said that evidence of poverty, particularly where that poverty has apparently resulted from the efforts to meet obligations arising from an illness resulting from the injury in suit, is not prejudicial.

[9] ID.—CONSIDERATION OF EVIDENCE BY JURY — INSTRUCTIONS. — In such an action, a requested instruction by the defendant, that if the testimony offered by the defendant, Southern Pacific Company, showed that there was no negligence at said time and place, then the verdict must be for the defendant, was incorrect, and by striking out the phrase "offered by the defendant, Southern Pacific Company," the court made the instruction speak the law correctly.

[10] ID.—CAUSE OF DEATH — EVIDENCE — INSTRUCTIONS.—In such action, the jury was to arrive at a determination of the cause of the death of the deceased from all of the evidence in the case, and an instruction which would have instructed the jury to take into consideration only the evidence offered by the defendant would have been erroneous.

[11] ID.—ISSUES—INSTRUCTIONS.—Instructions, requested by plaintiff, which instructed the jury in effect that an injured person was required only to secure such medical treatment and to have the injury treated in the same way as an ordinarily reasonable and prudent person would have had it treated should not have been given where they had no application to any issue in the case; and likewise instructions, given at plaintiff's request, dealing

with the employment of the deceased by the concern to whom the pipes were being shipped, were wholly extraneous and had no place in the case, there being no dispute that the deceased was not in the employment of said concern.

[12] ID.—INSTRUCTIONS.—In such an action, the contention of defendant that an instruction, that "it is sufficient to entitle him (plaintiff) to recover if the plaintiff shall have proven by a preponderance of the evidence all of the material allegations of any one of the causes of action," left the determination of the material allegations to the determination of the jury, is without merit where in another instruction the court had already pointed out the material averments of the complaint in each cause of action.

APPEAL from a judgment of the Superior Court of Humboldt County. George D. Murray, Judge. Reversed.

The facts are stated in the opinion of the court.

Frank McGowan and Blaine McGowan for Appellant.

Puter & Quinn for Respondent.

LENNON, J.—This is an appeal by the defendant, Southern Pacific Company, from a judgment rendered against it in the sum of fifteen thousand dollars and in favor of the plaintiff, as administrator of the estate of Peter Carmine, deceased, as damages for the death of said deceased resulting from an injury alleged to have been suffered by the deceased as the result of the negligence of the defendant. The main contention urged in support of a reversal is that it was not shown that the injury to the deceased was the proximate cause of his death. It is argued in this behalf that the verdict of the jury, with its implied finding that the death of the deceased proximately resulted from the injury caused by defendant, rested, not upon the firm foundation of satisfactory evidence, but rather upon conjecture, surmise and speculation.

It is plaintiff's claim that, while the deceased's death did not immediately follow the infliction of the injury, nevertheless, the injury was the initial step in a chain of causation which resulted finally and as a natural consequence in the death of the deceased. And while there are several distinct steps in the claimed chain of causation, and while the death occurred some little time after the infliction

of the injury, both of which factors render more difficult, of course, the task of the plaintiff of proving a direct causal connection between the death and the injury, nevertheless, we cannot say the plaintiff has not sufficiently shown by competent evidence a causal connection existing between each link in the chain and the step immediately preceding it.

Peter Carmine, so the evidence shows, in 1914, at the time of the alleged injury, was living with his family on a ranch near Klau, in San Luis Obispo County, about fifteen miles from Paso Robles. The ranch was a stock and dairy ranch. During the latter part of May, 1914, Carmine entered into an arrangement with the superintendent of a quicksilver mine near Klau to haul some of the mining machinery from the mine to Paso Robles and to there load it into the cars of the defendant, Southern Pacific Company. The machinery consisted of heavy quicksilver pipes, which were about six or eight feet long, about twelve inches in diameter and each weighing between six and seven hundred pounds. The pipes were too heavy for Carmine to handle alone and Carmine hired a helper, Charles Pemberton, to assist him in loading the pipes into the box-car. The pipes were first loaded upon a hand truck, known in railroad parlance as a "dolly." The "dolly" was rolled into the car over an iron apron which overlapped the station platform and the threshold of the car. When placing the pipes in position, in the north end of the car, Carmine used a crowbar and Pemberton, his helper, used a car stake as a pry. Carmine and his helper were in the act of placing one of these pipes in position when the car was jarred by the impact of two empty box-cars which were "bumped" against it by a locomotive operating in the vicinity. This "bumping," it is alleged, caused the injury to Carmine's back. Pemberton described the bumping and its results in this manner: "We had one end [of a quicksilver pipe] up there and we had our wooden pry, a kind of a car stake about three by three and a crowbar. Carmine was upon the right of me, and we were moving that to the north end of the car inside, and he [Carmine] was lifting that up kind of leaning ahead of this way when this bump came. When the bump came against the car, with the jar I dropped my bar, and that threw the weight on him, and it kind of broke him

down like, and he turned around a couple of times and put his hand on his back." In coupling on to the "empties" the locomotive, it appears, struck the car on to which it was being coupled with such force that it drove the two cars against the car in which Carmine and his helper were working driving that car back several feet. Pemberton testified that after the accident he and Carmine replaced the iron apron, which had slewed around, and finished loading the remaining two pipes into the car. The testimony of Pemberton is sufficient to sustain the implied finding of the jury that the accident which is alleged to have caused the injury · actually occurred. The story of the manner in which the accident occurred is not so inherently improbable as to warrant this court in saying that the jury was not justified in finding that it did happen.

Carmine's wife testified that upon Carmine's return home the next day he did not jump down from his wagon as was his habit, but climbed down, first stepping on the hub of the wheel and then stepping to the ground. She helped him unharness and put away the team. When he got off of the wagon he put his hand to his back. That night he awakened her with the request that she rub his back. At the time she noticed that it "was a little swollen and felt hot" to her hand and "there was some projection of one of the vertebra." She had had occasion to notice a few days before that his back was not in that condition.

There is testimony in the record tending to show that the deceased previous to the injury to his back was an active, hardworking, healthy man. After the accident Carmine was unable to do any lifting, his father or his wife lifting the buckets of milk for him after he had milked the cows on his ranch. He walked stooping over to the left with his hand on his back. His left leg gradually became shortened and drawn up. Although previously he had been a sound sleeper he became restless and there were nights when he could not sleep at all. In June, 1915, he was in bed for over three months and during that time had no use of his lower limbs. Both arms were affected and his wife had to feed him. He gradually got better and was able after a time to walk with two canes.

Dr. Sobey, the doctor who attended Carmine prior to and at the time of his death, testified that although he had

made no examination of Carmine's spine because it was an old injury and he was interested mainly in the tubercular phase of the case, still his spine was out of alignment; "he was not straight up and down"; "he walked with a cane and a decided limp" and he was "inclined to the side." This is clearly sufficient to prove the injury to the spine even if the entire testimony of Professor De Brock, a professional masseur, who was perhaps not qualified to testify as to any facts calling for a detailed knowledge of anatomy, be disregarded. The fact, however, that a professional masseur was consulted corroborates to some extent the fact that Carmine had sustained an injury to his back. There is also other testimony that he sought the aid of several physicians in an effort to obtain relief. His weight steadily declined. In 1915 he weighed about 145 pounds; in 1916, 130 pounds; in 1917, about 115 pounds, and in 1918, at the time of his death, he weighed but 85 pounds. During this time he had developed a tubercular cough.

Dr. Chain, who had practiced as a physician and surgeon for fifteen years and who was at the time of the trial city physician and health officer of Eureka, testified that the accepted theory at the present time in reference to the presence of tuberculosis germs in the human body is that practically one hundred per cent of the people have a tubercular lesion in their body somewhere, and in some stage of the disease, either healed, quiescent or in an active state. He testified that anything that would lower the general resistance of a person would cause a quiescent tubercular process to "light up."

In 1918 Carmine developed a rectal abscess which the physician who attended him testified was probably tubercular in origin. An operation was performed in July, 1918. Carmine's vitality was very low and he failed to rally from the anesthetic administered preparatory to the operation. The evidence is clear that it was reasonable and probable that the rectal abscess was due to the tuberculosis from which Carmine was suffering. Dr. Sobey testified that the operation he performed was for fistula ano, "probably tubercular in origin"; that he found Carmine tubercular at the base of the spine; that his body was "practically riddled with tuberculosis." He testified very positively that although the abscess might possibly be due to some

other cause, because of the tubercular condition of the patient he considered the abscess tubercular in origin. This testimony completes the chain of causation contended for by plaintiff.

[1] The jury were justified under the evidence hereinabove set out in arriving at the conclusion, as they evidently did, that the back of the deceased was wrenched; that as a consequence he suffered pain with attendant loss of sleep which resulted in a lowering of his vitality; that by reason of his weakened power of resistance he became the prey of tuberculosis; that as a result a rectal abscess, tubercular in origin, developed, which necessitated an operation which resulted fatally. In other words, the jury found, and were justified in finding, that the ultimate result could be traced through successive stages to the original injury, and that the responsibility rested upon the one who put in operation the chain of events which resulted in the death of the deceased.

[2] It was not necessary for the plaintiff, in order to recover, to show that the tuberculosis was traumatic in origin. If, on account of the depleted and weakened condition of a person caused by an injury, he is rendered more susceptible to germs than if he had not been injured, or if, because of his debilitated condition, he is unable to resist the attack of germs present in his system, then the disease resulting from the germs is a natural sequence to his condition resulting from the injury and the injury is the proximate cause of his death and the disease is but one of the links in the chain of causation. (*Robinson* v. *National Life & Acc. Ins. Co.,* 76 Ind. App. 161 [129 N. E. 707]; *Larson* v. *Boston Elev. Ry. Co.,* 212 Mass. 262 [98 N. E. 1048, 1050]; *Crane El. Co.* v. *Lippert,* 63 Fed. 942 [11 C. C. A. 521]; *Jones* v. *City of Caldwell,* 20 Idaho, 5 [48 L. R. A. (N. S.) 119, 116 Pac. 110]; *Ohio & M. Ry. Co.* v. *Hecht,* 115 Ind. 443 [17 N. E. 297].)

[3] One of the contentions of the defendant is that the trial court erred in permitting an amendment of the plaintiff's complaint changing the date of the alleged accident from May 20, 1914, as testified to by Mrs. Carmine and by the plaintiff, to May 27, 1914. This amendment was occasioned by the fact that the defendant introduced in evidence a letter from Carmine himself written to the owner

of the machinery which he had been loading, which fixed the date of the loading as May 27, 1914. The trial of the case took place some five years after the accident, and considering the nature of the accident, which at the time appeared to be trivial, it is quite natural that the exact date of the injury should not have been retained in the minds of the witnesses. Furthermore, there is no question but that the car in question was loaded by the deceased and his helper, as alleged in the complaint. The permission to make the amendment was, therefore, properly within the discretion of the trial court. (Sec. 473, Code Civ. Proc.)

[4] Testimony, admittedly hearsay, was introduced on the part of the plaintiff to show, it was claimed, that the deceased had received ordinary care after the injury and that his injuries and death were not due to lack of such care. This testimony, to which objection is made, was the testimony of Mrs. Carmine as to the opinions and advice of others as to the proper treatment of her husband. Mrs. Carmine was permitted to testify that Dr. Glass recommended exercise of the arms and lower limbs; that Professor De Brock, the professional masseur, was highly recommended to her by one of his patients; that she had called Dr. Dresser on the phone and explained to him the symptoms of the deceased, and that Dr. Dresser told her to go ahead with the treatment she was using and also indicated other treatments to be employed; that a lady nurse instructed her how to rub her husband's back, and that a man nurse told her that where he had worked in a hospital in Los Angeles they were always using hot applications for an injury of the same kind as her husband's. Mrs. Carmine was permitted to testify, over the objection of the defendant, that Dr. Dresser recommended that deceased see a bone specialist by the name of Dr. Baldwin; that Dr. Dresser told him to go see a man whom Dr. Baldwin had operated on in order to satisfy himself of the doctor's ability; that her husband had gone to see the man; that the man had been operated on by Dr. Baldwin because one of his vertebra was diseased; that the man had had to wear a brace for a long time thereafter and could not lift fifty pounds. In other words, Mrs. Carmine was permitted to testify as to what her husband had said this man had told him. This was hearsay twice removed. Mrs. Carmine ad-

mitted on the stand that her knowledge was derived from her husband and that she based her description regarding this man's condition not only upon what her husband had told her but also on what a good many other people had said. The defendant had no opportunity to contradict this hearsay testimony, and while, perhaps, no single instance narrated in the testimony complained of could be said to be seriously prejudicial, nevertheless the frequency and persistency with which this testimony was iterated and re-iterated could not, we think, fail to make a substantial impression upon the minds of the jury adverse to the defendant's case.

[5] The declarations made by the deceased, as testified to by the father-in-law of the deceased, concerning the condition of his back, which were made several hours after the accident, were plainly hearsay. The father-in-law of the deceased testified, among other things, that the deceased spent the night at his home after the accident and then complained of his back, saying it "was wrenched." Clearly that did not constitute any part of the *res gestae* and, therefore, did not fall within the exception to the hearsay rule. (*Estate of James,* 124 Cal. 653 [57 Pac. 578]; 10 Cal. Juris. 1076.)

[6] The admission in evidence of a book marked "day," purporting to be a memorandum kept by Peter Carmine, the deceased, showing an account between himself and his father, was improper. In order to show that two years before the alleged injury the deceased was a sick man requiring medical attention and in contradiction of the testimony of Mrs. Carmine that the deceased was in good health before the time of the alleged injury, Sonne, a stage driver, testified on behalf of the defense that he had delivered to the deceased some arnica and smartweed to be used on his back. In rebuttal of the testimony of Sonne and in support of the testimony of Mrs. Carmine to the effect that the medicine was used by the father of the deceased and not by the deceased, the plaintiff introduced in evidence several pages from the book marked "day," claimed to contain an account in the handwriting of the deceased of transactions between the deceased and his father, which pages showed items of medicine similar to that delivered

by the stage driver bought by the deceased and charged to his father.

The entries in question were in the nature of a private memorandum of the deceased, and the admissibility of the various items are governed and controlled by the provisions of section 1946 of the Code of Civil Procedure, which reads as follows:

"The entries . . . of a decedent, made at or near the time of the transaction, and in a position to know the facts stated therein, may be read as *prima facie* evidence of the facts stated therein, in the following cases: 1. When the entry was made against the interest of the person making it. 2. When it was made in a professional capacity and in the ordinary course of professional conduct. 3. When it was made in the performance of a duty specially enjoined by law."

The point decided in this case is analogous to that decided in the case of *Thompson* v. *Orena*, 134 Cal. 26, 30 [66 Pac. 24], wherein it was said:

"A private memorandum-book in the handwriting of decedent and kept by her in her lifetime, showing items of money collected for rent, and other collections, as well as expenditures, and including items of money paid to plaintiff, was placed in evidence by appellant, and afterwards stricken out on motion of plaintiff. In this there was no error. Section 1946 of the Code of Civil Procedure provides as to what entries or writings of a decedent may be used as evidence, and these entries, offered as they are on behalf of the estate of the decedent, are not admissible under that section. The book, containing only private memoranda, cannot be held admissible under the rule admitting tradesmen's books, or other entries made in the regular course of business."

[7] Perhaps the most serious error was the introduction in evidence of the testimony of Mrs. Carmine to the effect that Peter Carmine was unable to take certain treatments because of the fact that he had no money and that everything he owned was mortgaged. The introduction of the testimony was permitted upon the issue of reasonable care after the injury, but, as has been pointed out no such issue was made. Although an instruction was given to the effect that the pecuniary circumstances of the plaintiff or

the heirs of the deceased could not increase or diminish the amount of damages which the plaintiff was entitled to recover, if entitled to recover at all, it cannot be said to have cured the error. The court's instruction was general. The jury were not told to disregard this particular evidence. On the contrary a motion made by the defendant to strike out was refused. This refusal sanctioning as it did the evidence, accentuated the error of its introduction. It cannot be said that by reason of the general instruction the minds of the jury recurred to this particular evidence and eliminated it from consideration. Where the element of sympathy enters into a case, the difficulty is that it is as likely to result in the giving of a verdict against the evidence of nonliability as it is to increase the verdict where a liability exists. Sympathy permeates the whole case and introduces an irrelevant factor which may result not only in the giving of an excessive verdict but a verdict where none would otherwise be given. **[8]** It cannot be said, we think, that evidence of poverty, particularly where that poverty has apparently resulted from the efforts to meet obligations arising from an illness resulting from the injury in suit, is not prejudicial. The cases in this state are unanimous in holding the admission of such testimony prejudicial error sufficient to call for a reversal of the case. (*Mahoney* v. *San Francisco etc. Ry. Co.*, 110 Cal. 471 [42 Pac. 968]; *Green* v. *Southern Pac. Co.*, 122 Cal. 563 [55 Pac. 577]; *Story* v. *Green*, 164 Cal. 768 [Ann. Cas. 1914B, 961, 130 Pac. 870]; *Steinberger* v. *Cal. Electric etc. Co.*, 176 Cal. 386 [168 Pac. 570]; *Johnston* v. *Beadle*, 6 Cal. App. 251 [91 Pac. 1011]; *Wilbur* v. *Emergency Hospital Assn.*, 27 Cal App. 751 [151 Pac. 155]; *Lawrence* v. *Southern Pac. Co.*, 189 Cal. 434 [208 Pac. 966]; *Malone* v. *Hawley*, 46 Cal. 409].)

As previously indicated, the errors narrated undoubtedly contributed materially to the verdict and must, therefore, be held to have been prejudicial to the defendant's case. As a consequence the case must be remanded for a new trial.

In view of the necessity for a new trial some discussion is proper of the contentions made by the appellant that certain instructions given to the jury were erroneous. Instruction No. 2 requested by plaintiff is a mere general stereotyped instruction which is given in nearly every case.

It merely stated the settled rule as to how the jury should weigh the evidence and cannot, we think, be said to be prejudicial to the defendant in the instant case. Instruction 12 of plaintiff's requested instructions, however, is not very clear and might well have been omitted. In view of the fact that there were no particular or peculiar presumptions arising out of the evidence it seems unnecessary to charge the jury that "by the term preponderance of evidence is meant simply when all the evidence, *including the presumption of law, if there be any applicable to the case,* on one side, taken together, is stronger. than all the evidence on the other side, taken together, *including the presumption of law.*" [9] Defendant objects to a modification of its requested instruction No. 2 which before modification stated that if the testimony offered by the defendant, Southern Pacific Company, showed that there was no negligence at said time and place, then the verdict must be for the defendant. As so stated it was clearly incorrect. The jury are to determine from *all* of the evidence in the case whether or not there was negligence shown on the part of the Southern Pacific Company. By striking out the phrase "offered by the defendant, Southern Pacific Company" the court made the instruction speak the law correctly. The same is true of the criticism of the modification made of defendant's requested instruction No. 5. The defendant claims that the jury should have been instructed that omitting the evidence of the plaintiff as to the cause of the death the defendant was entitled to a verdict if its evidence showed that the deceased did not die from the alleged injury. [10] The jury was to arrive at a determination of the cause of the death of the deceased from all of the evidence in the case and an instruction which would have instructed the jury to take into consideration only the evidence offered by the defendant would have been clearly erroneous. Of these two instructions as given the defendant has no grounds for complaint.

[11] Instructions No. 9 and No. 14, requested by plaintiff, which instructed the jury in effect that an injured person was required only to secure such medical treatment and to have the injury treated in the same way as an ordinarily reasonable and prudent person would have had it treated, was wholly unnecessary since it had no application

to any issue in the case. The defendant had not alleged or attempted to prove that the absence of medical treatment or inefficient service was the cause of Peter Carmine's death. Such instructions could have had no tendency but to confuse the jury and should, therefore, have been omitted. So, likewise, the instructions No. 10 and No. 11, given at plaintiff's request, dealing with the employment of the deceased by the Joshua Hendy Iron Works to whom the quicksilver pipes were being shipped were wholly extraneous and had no place in this case. There was no dispute that the deceased was not in the employment of said company.

[12] Defendant claims that instruction No. 13 which instructed the jury that "it is sufficient to entitle him [plaintiff] to recover if the plaintiff shall have proven by a preponderance of the evidence all of the material allegations of any one of the causes of action" left the determination of the material allegations to the determination of the jury. Inasmuch as the court, in Instruction No. 3, had already pointed out the material averments of the complaint in each cause of action, this contention is without merit. We have critically examined the remaining instructions challenged by counsel for the appellant and we are satisfied that the instructions are not susceptible to the criticism made against them.

The judgment is reversed and the case remanded for a new trial.

Wilbur, C. J., Waste, J., Richards, J., Seawell, J., and Lawlor, J., concurred.

MYERS, J., Concurring.—I concur in the judgment and with what is said in the opinion of Mr. Justice Lennon herein, except that I am inclined to the opinion that the evidence herein is insufficient to support the implied finding of the jury that the death of the decedent proximately resulted from the original injury complained of.