[Civ. No. 41247. Second Dist., Div. Two. Sept. 24, 1974.]

THOMAS L. SELF et al., Plaintiffs and Appellants, v.
GENERAL MOTORS CORPORATION, Defendant and Appellant;
VERNE PRIOR, Defendant and Respondent.

GEORGE WILLIAM MOORE et al., Plaintiffs and Appellants, v.
GENERAL MOTORS CORPORATION, Defendant and Appellant.

**COUNSEL**

Heily, Blase, Ellison & Wellcome, DeWitt F. Blase and Edward L. Lascher, for Plaintiffs and Appellants.

Spray, Gould & Bowers, L. Raymond Millard, Richard A. Neumeyer, Hillsinger & Costanzo, John J. Costanzo, Robert V. Keller, Ross L. Malone and Thomas W. Watkins for Defendant and Appellant.

No appearance for Defendant and Respondent.

**OPINION**

**FLEMING, J.**—At 11 p.m. on 10 April 1968, Verne Prior, driving on U.S. 101 under the influence of alcohol and drugs at a speed of 65 to 85

miles an hour, crashed his 1963 Chrysler into the left rear of a 1962 Chevrolet station wagon stopped on the shoulder of the freeway for a flat tire. In the crash the Chevrolet station wagon was knocked into a gully, its fuel tank ruptured, and the vehicle caught fire. Two of its occupants were killed, and two others, one of whom was plaintiff Christine Smith, a passenger in the front seat, sustained severe burn injuries.

Smith and others brought an action for personal injuries against Prior for negligent driving and against General Motors in negligence and strict liability for defective manufacture and defective design of the station wagon, in particular the welding of the fuel tank and its placement in the left rear fender section. Subsequent to the jury's verdict, which included damages of $350,000 for Smith against both defendants, the trial court denied General Motors' motion for judgment notwithstanding the verdict, but granted its motion for a new trial because juror Spencer on *voir dire* concealed personal history and withheld opinions about General Motors' design of the station wagon and because plaintiff's attorney improperly brought to the jury's attention the limited amount of Prior's insurance coverage.

General Motors appeals the denial of judgment notwithstanding the verdict, and Smith appeals the grant of a new trial.[1] In brief, General Motors contends its station wagon contained no defects in design, but if it did, defective design did not cause or contribute to Smith's injuries. Smith contends that her attorney properly questioned Prior about the amount of his insurance, that juror Spencer concealed nothing of consequence, and that in any event such asserted errors were nonprejudicial.

## I

The evidence established that no matter how the fuel tank in the Chevrolet station wagon might have been welded, it would have ruptured when struck by a vehicle traveling at a speed of 65 to 85 miles an hour. Plaintiff therefore did not press her claim of defective manufacture, but

[1]Other plaintiffs in this action included Deborah Self Beamon, injured in the collision; Thomas Self, Sr. and Norma Self, whose son was killed in the collision; George and Dorothy Moore, whose son was also killed in the collision; and Frank Smith, Jr., former husband of plaintiff Christine Smith. The jury returned verdicts in their favor for $7,500, $20,000, $10,000, and $100, respectively, against Prior and General Motors. All plaintiffs appealed the order granting General Motors a new trial. Christine Smith's opening brief states that General Motors has settled with all other plaintiffs except Frank Smith, Jr., and "[u]nder the doctrine of *de minimus* [*sic*], the appeal will be ignored as to the ex-husband [Frank Smith]."

All plaintiffs protectively appealed the judgment in their favor but against Prior only; General Motors likewise protectively appealed the judgment.

concentrated on the claim that General Motors had defectively designed the station wagon when it located its fuel tank in the left rear fender section separated from the passenger compartment by only a few layers of metal. Plaintiff's experts testified that the station wagon's fuel tank was located in a vulnerable position, that this location made the vehicle unreasonably dangerous to use, that earlier-model station wagons and passenger automobiles had their fuel tanks located underneath the body inside the crossbars of the frame, that if the station wagon's fuel tank had been similarly located it would have been well-protected in the collision.

The foregoing testimony was sufficient to make a prima facie case in support of plaintiff's claim that the station wagon had been defectively designed. While the word "defect" is not capable of precise definition in all cases (*Culpepper* v. *Volkswagen of America, Inc.,* 33 Cal.App.3d 510, 517 [109 Cal.Rptr. 110]) and while defective design is an amorphous and elusive concept once we have progressed beyond the idea of fitness for intended use, its contours certainly include the notion of excessive preventable danger. When an automobile's fuel tank has been located in a position relatively more hazardous than others, when the added hazard of its location has been recognized by the industry, when the danger is well-known to the designers, and when the tank could have been readily relocated in a safer position, a jury could conclude that the location of the fuel tank made the design of the automobile defective. On the subject of defective design the jury was presented with the experience, opinions, and reasons of plaintiff's experts, who testified one way, and the experience, opinions, and reasons of General Motors' expert, who testified the other way. It was the jury's responsibility to evaluate this evidence and draw its own conclusions. (*Donahue* v. *United Artists Corp.,* 2 Cal.App.3d 794, 803 [83 Cal. Rptr. 131].) When substantial credible evidence is presented on both sides, the jury's verdict on defective design will not be disturbed.

General Motors, however, contends that defective design was not properly an issue in the case, for a design is defective only if it results in a product which is unsafe for its intended use. (*Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R. 3d 1049].) Here, no evidence was produced to show the station wagon was unsafe for its intended use of operation on the highway. Since the station wagon was obviously not intended to be used as a stationary target for another vehicle traveling at 65 to 85 miles an hour, the injuries that resulted from the collision were not attributable to the design of the station wagon, and therefore judgment notwithstanding the verdict should have been entered in General Motors' favor. This argument of General Motors follows a logical course, but its premise has been repudiated by the Su-

preme Court in *Cronin* v. *J.B.E. Olson Corp.,* 8 Cal.3d 121, 126 [104 Cal.Rptr. 433, 501 P.2d 1153]: "[The] argument that the van was built only for 'normal' driving is unavailing. We agree that strict liability should not be imposed upon a manufacturer when injury results from a use of its product that is not reasonably foreseeable. Although a collision may not be the 'normal' or intended use of a motor vehicle, vehicle manufacturers must take accidents into consideration as reasonably foreseeable occurrences involving their products. (*Passwaters* v. *General Motors Corporation* (8th Cir. 1972) 454 F.2d 1270, 1276; *Larsen* v. *General Motors Corporation* (8th Cir. 1968) 391 F.2d 495, 501-503; 80 Harv.L.Rev. 688, 689 (1967); contra, *Evans* v. *General Motors Corporation* (7th Cir. 1966) 359 F.2d 822, 825, cert. den., 385 U.S. 836 [17 L.Ed.2d 70, 87 S.Ct. 83].) The design and manufacture of products should not be carried out in an industrial vacuum but with recognition of the realities of their everyday use." A motor vehicle manufacturer is required to foresee that as an incident of normal operation in the environment in which his product will be used accidents will occur, including high-speed collisions between vehicles. Because of this possibility he is required to design his vehicle to minimize unreasonable risks of injury and death. From this duty it follows that a motor vehicle manufacturer must take into account the possibility of high-speed collisions when it selects a location for the fuel tank in the vehicle. (See *Culpepper* v. *Volkswagen of America, Inc.,* 33 Cal.App.3d 510, 518 [109 Cal.Rptr. 110]; *Mickle* v. *Blackmon* (1969) 252 S.C. 202 [166 S.E.2d 173, 42 A.L.R.3d 525], and Annot. 560, 571-572.)

■ Stated more generally, the law now requires a manufacturer to foresee some degree of misuse and abuse of his product, either by the user or by third parties, and to take reasonable precautions to minimize the harm that may result from misuse and abuse. The manufacturer must evaluate the crashworthiness of his product and take such steps as may be reasonable and practicable to forestall particular crash injuries and mitigate the seriousness of others. (*Cronin* v. *J. B. E. Olson Corp.,* 8 Cal. 3d 121, 126 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Pike* v. *Frank G. Hough Co.,* 2 Cal.3d 465, 473-474 [85 Cal.Rptr. 629, 467 P.2d 229]; *Thomas* v. *General Motors Corp.,* 13 Cal.App.3d 81, 89 [91 Cal.Rptr. 301].) We recognize the impossibility of making a product foolproof or failsafe, and we appreciate the need to balance one consideration against another in designing a complicated product so as to achieve reasonable and practical safety under a multitude of varying conditions. We are also well aware that prosecution of a lawsuit is a poor way to design a motor vehicle, for the suit will almost invariably emphasize a single aspect of design to the total exclusion of all others. For example, defective design is claimed

here because the vehicle was not sufficiently crashworthy from the rear. Defective design was claimed in *Evans* v. *General Motors Corporation* (7th Cir. 1966) 359 F.2d 822, because the vehicle was not sufficiently crashworthy from the side; in *Dreisonstok* v. *Volkswagenwerk, A.G.* (4th Cir. 1974) 489 F.2d 1066, because not sufficiently crashworthy in front; and in *Larsen* v. *General Motors Corp.* (8th Cir. 1968) 391 F.2d 495, because not sufficiently crashworthy in a head-on collision. Protection gained against a head-on collision may be at the expense of protection against one that is broadside, for like an army in battle the vehicle can't be uniformly strong at all points and under all conditions. We also appreciate that consensus design may tend to freeze innovation and inhibit manufacturers from making products that have not been made before. For example, in *Dreisonstok, supra,* where the driver ran his microbus off the road into a telephone pole, plaintiff charged as defective design the positioning of the engine in the rear of the vehicle, as a result of which the occupants of the front seat were no longer protected by six feet of vehicle ahead of them. It is literal horse-and-buggyism when removal of the horse from front to rear is faulted as defective design.

Yet it remains indisputable that the prospect of product liability for injuries resulting from misuse and abuse keeps the manufacturer on his toes and thereby serves a socially useful purpose. Manufacturers of motor vehicles are not without resources, and it seems reasonable to predict they will find ways to bring home, even in a courtroom, the difficulties and hard choices inherent in designing a complicated product so as to forestall to the fullest extent practicable the multitudinous possibilities of the product's abuse and misuse. It also seems probable that legislatures and courts will develop techniques for summary disposition of extravagant claims of defective design so that the good in product protection against injuries resulting from abuse and misuse is not drowned in a sea of unmeritorious demands for payment of the wages of recklessness and folly. (Cf. National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. §§ 1381-1431.)

An additional problem inheres in defective design claims based on the manufacturer's failure to anticipate a particular abuse or misuse of his product, and this is the possibility that the abuse or misuse of the product is so magnified that defective design, if it exists, becomes immaterial to the injuries suffered. For example, a watch should be designed to withstand damage from being sat upon, but it need not be designed to withstand the blow of a hammer; if a watch is destroyed by a hammer blow, its good or bad design for purposes of being sat upon is immaterial to its destruction. (Cf. Rest., Torts, § 432(1).) In legal terms, the problem involves general causation and superseding cause, issues that General Motors vigorously presses here. It argues that even if the design of its station

wagon was defective because of the location of its fuel tank, the defect did not contribute to Smith's injuries, for the violence of the impact and the severity of the collision would have caused the fuel tank to catch on fire and would have brought about plaintiff's injuries even if the tank had been located underneath the body and inside the crossbars of the frame. It points out that the gas tank in Prior's 1963 Chrysler, located in the allegedly "safe" position extolled by plaintiff as conforming to principles of good design, also ruptured and caught on fire in the collision. General Motors cites the testimony of its own expert, who concluded that the damage suffered by the station wagon in the collision was so extensive that the location of its fuel tank was not a substantial factor in bringing about plaintiff's injuries. General Motors then argues that all credible evidence on causation was in its favor, and therefore the trial court erred in not granting its motion for judgment notwithstanding the verdict. In opposition, plaintiff cites the testimony of her own expert, who testified that the area below the floor of the vehicle in the rear of the seats "was not appreciably damaged. Had the tank been in such a location, it would have been well protected by the structure of the automobile." It is possible to infer from this expert's opinion that with proper fuel tank positioning the station wagon either would not have caught fire or would not have burned the way it did and plaintiff's injuries in the collision would have been lessened. As we evaluate the record, these conflicting expert opinions, together with photographs of the wreckage and the wreckage itself, created a sufficiently debatable question of fact for submission to the jury, i.e., was the violence of the crash the effective, efficient cause of plaintiff's injuries to the extent that it superseded such other possible causes as defective design and made them immaterial? (*Love* v. *Wolf,* 249 Cal.App.2d 822, 838 [58 Cal.Rptr. 42].) We conclude, therefore, that the trial court properly treated the issue of causation as a jury question and correctly denied General Motors' motion for judgment notwithstanding the verdict.

An additional reason supports our conclusion that the causation issue was properly submitted to the jury. When plaintiff asked her experts the question, "[I]f the tank had been located under the car, do you have an opinion as to whether there would have been any damage to the gas tank and any resulting fire?" General Motors objected to the question on the ground of immateriality, and its objection was sustained. The question went directly to the issue of causation. At a later stage in the trial, General Motors asked its own expert the same question, and the court permitted him to answer. On this record General Motors may not complain about the sufficiency of the evidence against it on causation. ■ "Under the doctrine of invited error, a party may not object to the sufficiency of the evi-

dence to support a finding against him when the lack is the result of improper exclusion of evidence at his own instance." (*Watenpaugh* v. *State Teachers' Retirement*, 51 Cal.2d 675, 680 [336 P.2d 165].)

■ However, our discussion on causation and superseding cause is not yet finished. The theory of General Motors' defense was that no matter where the fuel tank might have been located the station wagon would have caught fire in a vehicular impact of the magnitude of the one that took place and plaintiff's injuries would have been the same. It is a commonplace to observe that a litigant is entitled to have the jury properly instructed on its theory of the case. (4 Witkin, Cal. Procedure (2d ed.) Trial, § 192, p. 3012.) This, we believe, did not happen. We think the trial court prejudicially erred in refusing to give the following specific instruction on superseding cause requested by General Motors: "If you find that the gasoline tank in the 1962 Chevrolet station wagon was improperly located, but that the fire would have occurred even if the tank had been properly located, its location was not a substantial factor in bringing about the fire and was, therefore, not a contributing cause thereof." This instruction is a correct statement of law (see *Signorelli* v. *Potter*, 43 Cal.2d 541, 545 [275 P.2d 449]), and its use would have brought into focus for the jury the critical issue of superseding cause raised by this defendant. Although the court instructed the jury on general cause and on concurrent cause (plaintiffs' theory of the case),[2] it failed to clarify for the jury the issue of superseding cause. Causation, both legal and factual, presents a difficult conceptual problem for jurors—and for trial judges and appellate judges, too, for that matter. Since the court's general instruction on causation did not go into the circumstances of this particular case but dealt with the defense of superseding cause by negative implication only, the jury may well have overlooked that defense in untangling the issues and arriving at its verdict. ■ A trial court should not require a party to rely on abstract generalities in presenting its legal theory of the case to the jury, but should instruct the jury on vital issues in terms that relate to the particular case before it. (*Borenkraut* v. *Whitten*, 56 Cal.2d 538, 545-546 [15 Cal.Rptr. 635, 364 P.2d 467]; *Menchaca* v. *Helms Bakeries, Inc.*, 68 Cal.2d 535, 542 [67 Cal.Rptr. 775, 439 P.2d 903].) If a new trial had

---

[2]Based on BAJI Nos. 3.76-3.78:

"A legal cause of an injury is a cause which is a substantial factor in bringing about the injury."

"There may be more than one legal cause of an injury or death. When the conduct of two or more persons or corporations contribute concurrently as a legal cause of an injury, the conduct of each of said persons or corporations is a legal cause of the injury regardless of the extent to which each contributes to the injury. A cause is concurrent if it was operative at the moment of the injury or death and acted with another cause to produce the injury or death."

not been granted by the trial court on other grounds, we would be compelled to reverse the judgment for inadequacy of instructions on the issue of superseding cause.

## II

The trial court granted General Motors a new trial on two grounds: (1) Juror Spencer concealed personal history and opinions relevant to the case, and (2) plaintiff's attorney improperly brought to the attention of the jury the limited amount of defendant Prior's insurance.

1. On examination of the prospective jury panel, which included Spencer, the court asked if its members were specially trained in law; dissatisfied with a General Motors' product; involved in design, manufacture, or repair of automobiles; associated with or interested in critics of the automobile industry; and whether they had ever owned a station wagon or held any opinion about the design and location of the fuel tank in a station wagon. Spencer told the court he had experience as an auto mechanic and road builder, he once owned a 1962 Rambler station wagon, and he currently drove a Cadillac about which he had no strong feelings of satisfaction or dissatisfaction.

After a nine to three verdict in which Spencer cast his vote against General Motors, an investigator for General Motors interviewed Spencer at home. During the course of a lengthy and rambling discussion Spencer told the investigator he had taken "five years of law." Spencer later explained in a declaration that his law consisted of an uncompleted correspondence course in business law taken during the years 1926 and 1927. Spencer also told the investigator that he had read a lot about and admired Ralph Nader's Raiders, that "I was going to buy a new Chevy in '62, a station wagon, and I wouldn't buy it because the gas tank was in the fender and I knew it," that he recently advised his daughter to sell her Ford station wagon because it had the fuel tank in the same place.

The trial court has broad discretion to grant a new trial for juror misconduct (*Weathers* v. *Kaiser Foundation Hospitals,* 5 Cal.3d 98, 109 [95 Cal.Rptr. 516, 485 P.2d 1132]) when a juror has concealed a state of mind that would prevent him from acting impartially. (*City of Pleasant Hill* v. *First Baptist Church,* 1 Cal.App.3d 384, 431 [82 Cal.Rptr. 1].) The post-trial statements of juror Spencer do not show general bias against General Motors or lack of willingness to decide the cause on its facts. Nor do they indicate any partisan or wrongful conduct during jury deliberations. (See *People* v. *Hutchinson,* 71 Cal.2d 342, 346, fn. 1 [78 Cal.Rptr. 196, 455 P.2d 132].) Post-trial probing of a juror's memory may reveal

latent facts, incidents, beliefs, or opinions that bear some relevance to the cause that evolved at trial, but such general revelations do not provide a solid basis to support the charge of juror misconduct. It is always possible that a juror's current opinions molded and educated during a month-long period, have been transposed in his own mind into antecedent wisdom and that the juror unjustifiably preens himself on always having been knowledgeable on the subject matter of the lawsuit about which he only recently became "expert." This possibility would seem particularly strong in the instance of juror Spencer, an elderly mechanic, retired from active life, somewhat boastful, and apparently garrulous. In sum we do not believe prejudicial juror misconduct occurred.

2. ■ The record, however, unquestionably demonstrates prejudicial error in the questioning of codefendant Prior about the limited amount of his insurance coverage. This issue climaxed when plaintiff's attorney asked Prior the following question: "Now, you mentioned your insurance; you had $25,000 worth of insurance on the car, is that right, sir?" Although Prior did not respond, the question answered itself.

Earlier, the general subject of insurance had been mentioned by Prior, but under different circumstances. Plaintiff's attorney questioned Prior about his activities on the afternoon of the accident: "Q. What did you do after you had that beer, sir? A. I went back down to the insurance company and got my insurance straightened out; and I also went to the Highway Patrol office to get my insurance straightened out because they had been—Q. We won't go into that too much." Prior's position at the trial was merely that of a nominal defendant, for his insurance company had settled with plaintiffs before trial for policy limits ($25,000 individual/$50,000 accident), he had no substantial assets of his own, and plaintiffs had agreed not to execute against him on any judgment they might obtain. Plaintiffs, however, did not dismiss their action against him, apparently to prevent removal of the cause by General Motors on diversity grounds from state to federal courts. General Motors' trial tactics were to dissociate its defense from Prior, to discredit him, and to place the entire blame for the accident on him. To that end General Motors, in questioning Prior, sought to point out that he had been separately represented by counsel at all times: "Q. Mr. Prior, is the gentleman seated back there with your wife, is he your lawyer? A. He is from the insurance company.

" . . . . . . . . . . . . . . .

"Q. . . . Did you, when you showed up for your deposition, did you have a lawyer there with you that was representing you, your lawyer?

■

A. Well, I think that—the lawyer from the insurance company, I think, was there."

Plaintiff's attorney subsequently asked Prior the fateful question about the limits of his insurance coverage. General Motors objected, the court sustained the objection, and it instructed the jury to disregard any implication in the question.

The jury's discovery of the limits of Prior's insurance, as contrasted with knowledge of insurance itself, clearly prejudiced General Motors' case. Prior's liability for negligence was obvious, and once the jury learned of his policy limits, it also learned it would have to find wealthy General Motors liable if it wanted to funnel a sizeable amount of damages to plaintiff Smith, since the limits of Prior's insurance could cover only a small portion of the damages she claimed. Smith argues this same information could have been presented to the jury as an instruction on the effect of settlement by one joint tortfeasor. (See BAJI No. 14.63.) But where the fact of settlement is undisputed and the fact of liability is disputed, that information may confuse the jury and prejudice the cause of the remaining litigants, and its use is frowned upon. (*Albrecht* v. *Broughton,* 6 Cal.App.3d 173, 178 [85 Cal.Rptr. 659]; *Shepherd* v. *Walley,* 28 Cal.App.3d 1079, 1082-1083 [105 Cal.Rptr. 387].) The better practice is thought to be for the trial court to adjust recoveries against joint tortfeasors in accordance with previously arrived settlements after the jury's verdict has been returned.

Here, the fact of settlement and of the limits of Prior's insurance had no legal relevance to the issues in the case. Prior's passing reference to insurance in other contexts did not justify a full-scale foray by plaintiff into the critical and sensitive subject of the amount of his insurance. We decline to hold as a matter of law that the trial court's admonition to the jury to ignore the question about the amount of Prior's insurance effectively wiped out the implications of that question from each juror's mind. Certainly the trial court itself did not reach such a conclusion. The trial court characterized the question as "obvious misconduct," a "premeditated wile contrived and calculated to tell the jury that if the substantial judgment to which plaintiff Christine Smith was entitled under the evidence was to be satisfied in any amount in excess of [$25,000], the jury must bring in a verdict against the debatably liable defendant General Motors as well as against the obviously liable defendant Prior. The misconduct was plainly prejudicial, preventing the defendant General Motors, and perhaps other parties as well, from having a fair trial. Likewise, I think it is plain that my admonition, prompt and unsolicited as it was, must have been wholly ineffective to remove the prejudice caused by the misconduct. Throughout the trial, plaintiffs' obvious tactic was to minimize the financial respon-

sibility of Mr. Prior and to emphasize that of General Motors. The vice in the misconduct here lies not in the familiar 'injection of the subject of insurance into the case' to show that Mr. Prior was insured and well able to respond in damages, but to show the contrary—that he was *not* adequately insured or otherwise financially responsible and thus to impress upon the jury that one of two concurrent or successive tort-feasors was unable to respond in damages in an amount in excess of [$25,000], if at all, and the consequent necessity of a finding against the other to satisfy a judgment for the very substantial damages warranted by the evidence."

The prejudicial effect of the misconduct was compounded by counsel's persistent and ill-advised references during the trial to General Motors' wealth and profits and the magnitude of its operations. At one point, for example, counsel called the jury's attention to General Motors' billion-dollar profits; at another he asserted that an award of $1,200,000 would only amount to 30 cents a vehicle when spread over General Motors' annual output. Such repeated references to a litigant's wealth or poverty in themselves amount to prejudicial misconduct. (*Weaver* v. *Shell Oil Co. of California,* 129 Cal.App. 232, 234 [18 P.2d 736] (wealth); *Love* v. *Wolf,* 226 Cal.App.2d 378, 388-389 [38 Cal.Rptr. 183] (wealth); *Ensign* v. *Southern Pac. Co.,* 193 Cal. 311, 321-322 [223 P. 953] (poverty); *Hoffman* v. *Brandt,* 65 Cal.2d 549, 552- 553 [55 Cal.Rptr. 417, 421 P.2d 425] (poverty).) As we have earlier discussed, the jury faced a difficult problem in the determination of General Motors' liability, particularly with respect to the issue of superseding cause. The trial court was in the best position to assess the impact of counsel's misconduct on the jury, and with its decision we agree. (*Malkasian* v. *Irwin,* 61 Cal.2d 738, 747-748 [40 Cal.Rptr. 78, 394 P.2d 822].)

### III

Plaintiff urges numerous errors favorable to General Motors at the trial, but none of these asserted errors went to the basic issue of causation. Plaintiff did not appeal the judgment against General Motors and has no standing to challenge the trial court's denial of plaintiff's untimely motion to amend her complaint to seek $50,000,000 punitive damages. (*Toole* v. *Richardson-Merrell, Inc.,* 251 Cal.App.2d 689, 717 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].)

### IV

To summarize, the trial court correctly denied judgment notwithstanding the verdict and properly granted a new trial. The appeals by plaintiffs Moore, Self, and Beamon are dismissed. The appeals by plaintiffs Smith

from the judgment against defendant Prior are dismissed. The appeal by General Motors from the judgment is dismissed. The order granting General Motors a new trial is affirmed. The order denying General Motors' motion for judgment notwithstanding the verdict is affirmed.

The parties will bear their own costs on appeal.

Roth, P. J., concurred.

**COMPTON, J.,** Concurring and Dissenting.—I concur in the affirmance of the order granting a new trial. But, in my opinion, a new trial should not be necessary and the trial court's order denying the motion for judgment notwithstanding the verdict should be reversed.

The majority opinion contains a scholarly and exhaustive analysis of the problems faced by a large affluent manufacturer in trying to protect itself against a jury simply awarding an injured plaintiff a large sum of money because of the manufacturer's ability to pay regardless of any solid evidence of liability. One jury has already done that in this case. In fact, the majority clearly indicates, though not in so many words, that General Motors' liability for *this* accident simply does not exist. They appear hopeful that a retrial will prove this to be the case.

The problem, as I see it, is that there is no guarantee that on a retrial, even under proper instructions, a similar miscarriage, but one that is beyond the power of the court to correct, will not occur. It is unjust to expose General Motors to such a hazard.

I agree that "a lawsuit is a poor way to design a motor vehicle," but to permit this issue to go to a jury gives the jury the power to do so with no guarantee that a jury can come to grips with the difficulties and hard choices inherent in designing a complicated product.

It is a matter of common knowledge that there is no place on an automobile where a tank holding 20 or so gallons of volatile gasoline can be "safely" located. Should General Motors then be held to have defectively designed the automobile because it required gasoline as a fuel? Absolutely not.

Thus in each case the involvement of the gas tank will depend on the circumstances of the particular crash. Plaintiff's expert testified that in this case the area below the floor of the vehicle was not appreciably damaged. From this it is argued that it was negligent not to have put the tank there. But what if the angle of the collision had been different or Prior's vehicle had been a low-slung sports car that went beneath the rear bumper and

struck the area which plaintiff contends is the "safe" area. Would plaintiff's expert then say in that case that it would be negligent to have the tank in such a position and that the tank should have been in the fender?

Clearly the fortuitous circumstances of a particular mishap should not be the controlling factor. General Motors' liability should not depend upon the direction or manner in which Prior impacted the target vehicle. The testimony of plaintiff's expert created no factual issue.

Thus the retrial may well degenerate into a debate over the probabilities as to which type of impact is most likely to occur or which kind of accident is the "most foreseeable," i.e., front, rear, side, etc.

The question of defective design is not whether the vehicle was designed to minimize the damage from the particular accident that *did* occur but whether on balance the vehicle is designed to minimize damage in the usual and foreseeable mishaps.

Anyone who purchases an automobile knows that if he is in an accident which happens to involve the gas tank, the threat of fire exists. Thus it would not be unreasonable to say that purchasers of automobiles should select the car which *they* feel has the tank in a position least likely to be involved in a severe impact. They know best the use to which the car will be put. If their choice proves to be unwise, there is no reason to require the manufacturer to have greater foresight.

To inject defective design into this case is an unwarranted extension of the rule of *Cronin* v. *J.B.E. Olson Corp.,* 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153].

*Cronin* cited with approval language from *Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57, at page 64 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]: " 'To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using [the product] in a way it was intended to be used as a result of a *defect in design . . . of which plaintiff was not aware* that made [the product] unsafe for its intended use.' " (Italics added.)

Clearly, in the case at bar, the plaintiff as noted must be chargeable with being aware of the danger of the presence of gasoline in the vehicle and a knowledge that the tank was located where it was. Further, there is no evidence that the positioning of the gas tank in the fender of the vehicle is a "defect in design" other than as noted it happened to be in a position at which the vehicle was struck.

Thus under the facts of this case the determination of the issue of whether or not there was in fact a defect in design in the vehicle must turn on an inquiry as to whether such a position made the vehicle "unreasonably dangerous." Despite the fact that the Supreme Court in *Cronin* appears to reject such a test, it is obvious to me that the *Cronin* court did not contemplate the type of factual situation which is present here.

To follow the reasoning advanced by the plaintiff in this case General Motors must have foreseen the probability of the car being struck at high speed on the left rear quadrant. The plaintiff knew that the gas tank was located in the left rear fender thus if the reasoning is followed that such a crash was foreseeable in designing the vehicle then the plaintiff would be negligent in parking the car in the position that he did with the left rear exposed to the impact. Surely the foreseeability of this accident should be no greater to the manufacturer than to the plaintiff.

Even the instruction offered by General Motors and rejected by the trial court is not completely satisfactory in directing the jury's inquiry because it deals too generally with the subject of "properly" locating the tank. "Properly located" for what? This particular accident? No, the question is "properly located" for the most common and expected occurrences. The evidence offered by the plaintiff failed completely to provide any basis for the jury to determine that the tank was not "properly located" or that the location of the tank had anything to do with plaintiff's injury except that it just happened to be in the location on which Prior targeted.

The majority states that a "manufacturer must evaluate the crashworthiness of his product and take such steps as may be reasonable and practicable to forestall particular crash injuries and mitigate the seriousness of others." I submit that there is no practical or reasonable way that an automobile can be constructed so that its fuel tank will remain intact against an impact from all directions at a speed of 65 to 85 miles per hour. Yet that is exactly what must be found if General Motors is to suffer liability in this case.

I would reverse the order denying General Motors' notice for judgment notwithstanding the verdict.

A petition for a rehearing was deemed denied October 25, 1974, pursuant to rule 27e, California Rules of Court. Petitions of all the appellants for a hearing by the Supreme Court were denied November 21, 1974.